NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2481-11T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JACOB R. GENTRY,

     Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **January 13, 2015** |
| **APPELLATE DIVISION** |

Argued October 21, 2014 - Decided January 13, 2015

Before Judges Reisner, Koblitz and Higbee.

On appeal from the Superior Court of New
Jersey, Law Division, Sussex County,
Indictment No. 09-02-0094.

Stephen W. Kirsch, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender,
attorney; Mr. Kirsch, of counsel and on the
brief).

Gregory R. Mueller, First Assistant
Prosecutor, argued the cause for respondent
(Francis A. Koch, Sussex County Prosecutor,
attorney; Mr. Mueller and Daniel Bajger,
Assistant Prosecutor, of counsel and on the
brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

REISNER, P.J.A.D.

Defendant Jacob R. Gentry appeals from his September 20, 2011 conviction for first-degree aggravated manslaughter, N.J.S.A. 2C:11-4a, and third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2, and from the sentence of thirty years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

On this appeal, defendant raises the following points for our consideration:

> POINT I
> THE STATE'S USE, OVER DEFENSE OBJECTION, OF THE CO-DEFENDANT'S STATEMENT TO POLICE -- BOTH WHEN CROSS-EXAMINING THE DEFENDANT, AND IN THE PROSECUTOR'S SUMMATION -- WAS A BLATANT VIOLATION OF DEFENDANT'S RIGHTS TO CONFRONT THE WITNESSES AGAINST HIM AND TO DUE PROCESS.
>
> POINT II
> THE TRIAL JUDGE IMPROPERLY PRECLUDED DEFENSE COUNSEL FROM OFFERING EVIDENCE ABOUT DAVID HAULMARK REGARDING BOTH:  (1) HIS REPUTATION FOR AGGRESSIVENESS UNDER N.J.R.E. 404(A)(2) AND (2) HIS PRIOR BAD ACT OF TRYING TO BITE HIS WIFE DURING A FIGHT, PURSUANT TO N.J.R.E. 404(B).
>
> POINT III
> THE JURY INSTRUCTION ON SELF-DEFENSE:  (1) IMPROPERLY LIMITED SELF-DEFENSE TO THE CRIME OF MURDER; (2) FAILED TO EXPLAIN TO THE JURY THAT, IF THE FIGHT WERE, INDEED, "MUTUAL COMBAT," SELF-DEFENSE WOULD NEVERTHELESS BE AVAILABLE TO DEFENDANT IF DAVID HAULMARK ESCALATED THE MATTER BEYOND A NORMAL

FISTFIGHT; AND (3) FAILED TO EXPLAIN TO THE JURY THE EFFECT THAT A "COURSE OF PHYSICAL ABUSE" CAN HAVE ON THE DETERMINATION OF WHETHER A DEFENDANT ACTED REASONABLY IN SELF-DEFENSE. (Not Raised Below).

POINT IV
THE JURY INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER IMPROPERLY FAILED TO ADDRESS THE ISSUES OF EITHER "MUTUAL COMBAT" AS A SOURCE OF ADEQUATE PROVOCATION, OR THE EFFECT THAT A "COURSE OF PHYSICAL ABUSE" CAN HAVE ON THE JURY'S DETERMINATION OF WHETHER THERE WAS ADEQUATE PROVOCATION. (Not Raised Below).

POINT V
THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

Defendant presents the following argument in a pro se supplemental brief:

POINT I
THE TRIAL COURT ERRED BY FAILING TO ACT SUA SPONTE IN SUPPRESSING DEFENDANT'S CONFESSION AS FRUIT OF A POISONOUS TREE WHERE [THE] CONFESSION WAS NOT MADE IN A KNOWING AND INTELLIGENT FASHION AND WHERE [THE] CONFESSION WAS OBTAINED BY EXPLOITATION OF ILLEGAL SEIZURE OR DETENTION, I.E., ARREST WHERE DEFENDANT WAS NOT ADVISED OF HIS TRUE TARGET STATUS AS A SUSPECT IN THE MURDER INVESTIGATION OF DAVID HAULMARK IN ADDITION TO RECEIVING MIRANDA WARNINGS CONSTITUTES PLAIN ERROR AND DEFENDANT WAS DENIED OF [SIC] A FAIR TRIAL AND DUE PROCESS OF LAW (U.S. CONST. IV, V, XIV; N.J. CONST. ART[.] I PARAS. 1, 10).

After thoroughly reviewing the voluminous record provided to us, we are constrained to reverse defendant's conviction due

to prejudicial trial errors. We remand this matter for retrial on both counts. We summarize our reasons as follows.

Defendant was charged with murder, aggravated manslaughter and reckless manslaughter in the death of David Haulmark. The State's theory was that defendant, his girlfriend Emily Henry (Emily or the girlfriend), and his brother Jarrod Gentry (Jarrod or the brother) attacked Haulmark and beat him to death. Defendant claimed self-defense and denied that the brother or the girlfriend participated in the incident. We find that defendant was denied a fair trial when the trial court erroneously failed to charge the jury that self-defense was a complete justification for aggravated manslaughter and manslaughter, in addition to being a defense to murder. The jury acquitted defendant of murder but convicted him of aggravated manslaughter. Because the evidence, viewed favorably to the defense, was sufficient to support a claim of self-defense, that error had the clear capacity to produce an unjust result. R. 2:10-2. Consequently, the aggravated manslaughter conviction must be reversed.

Other serious trial errors, viewed either separately or in combination with the charging error, also require reversal. Defendant, the brother, and the girlfriend were each indicted in

Haulmark's death, but defendant was tried separately.[1] Neither the brother nor the girlfriend testified at his trial. However, during the trial, the prosecutor[2] improperly cross-examined defendant about a statement the brother made to the police. The statement was hearsay and clearly inadmissible.

That error was compounded during summations when defense counsel tried to ameliorate the prejudicial impact of the prosecutor's improper tactic, and the trial court then erroneously permitted the prosecutor to tell the jury that the brother had made a statement that was kept from the jury due to the court's evidentiary rulings. Thus, the prosecution was first allowed to incriminate defendant with hearsay evidence from a co-defendant whom defendant had no opportunity to cross-examine. The State was then permitted to imply to the jurors that defense counsel had misrepresented the evidence and that the State had incriminating information which the jury had not been allowed to hear. Those errors violated fundamental constitutional principles designed to guarantee every defendant the right to a fair trial and had a clear capacity to produce a

---

[1] Defendant's procedural history advised us that the co-defendants pled guilty to "much lesser offenses"; the State's brief adopted defendant's procedural history.

[2] The State's case was presented by two prosecutors, one male and one female. When we refer to a specific prosecutor, we use the gender-appropriate pronoun.

miscarriage of justice.  See R. 2:10-2.  Because defendant testified as to his defenses on all issues, and the errors allowed the State to unfairly impugn his credibility, we are constrained to reverse the conviction in its entirety and remand for a retrial.

I

We summarize the evidence as it relates to the issues on appeal.  In particular, because self-defense must be charged if the evidence, viewed most favorably to the defendant, would support that justification, we focus on "the evidence that provides a rational basis for a self-defense charge."  State v. Rodriquez, 195 N.J. 165, 170 (2008); see also State v. Kelly, 97 N.J. 178, 200 (1984).[3]

During the spring and summer of 2008, defendant and Haulmark were among several hundred workers employed on a pipeline project in upstate New York.  Most of the workers, known as "pipeliners," were housed at the Legends Resort (Legends), a large hotel complex in Sussex County, New Jersey.  According to several witnesses, defendant suffered repeated harassment and physical attacks at the hands of Haulmark,

---

[3] Contrary to this principle, the State's brief presents the evidence in the light most favorable to the prosecution.

Haulmark's friend Sean ("Frog") Taxis[4], and several other pipeliners who were part of Haulmark's social group. Frog also made inappropriate advances to Emily. Defendant testified that complaints to the police about the harassment met with an unsympathetic response.

From the evidence, it can be inferred that Haulmark and his friends resented defendant because he was not from the local area, he was "scrawny" and dressed oddly, but he nonetheless had a beautiful and flirtatious girlfriend living with him in the hotel. According to witnesses, Frog, a small, loudmouthed, aggressive individual, tended to start fights, and Haulmark, a 235-pound former football linebacker, supplied the "muscle" to back him up.

In his statement to the police, and his trial testimony, defendant described several incidents in which Haulmark, Frog, and their companions attacked him without provocation. In one incident, they assaulted him in an elevator. On another occasion, they emerged from the hotel's bar and attacked him. Since defendant had to pass by the bar in order to reach his hotel room, he once asked a security guard for an escort. Patricia Prince, a former Legends security guard, corroborated

_____

[4] We refer to Taxis by his nickname, because all of the witnesses did so.

defendant's statement that in June 2008, defendant asked Prince to escort him and Emily to their hotel room, because they were afraid "[t]hat somebody would jump them."

In July 2008, defendant and Emily moved out of the hotel, and into a house an hour away from the job site, in order to avoid further harassment from Haulmark and his friends. In the early morning hours of August 17, 2008, defendant, Emily, and Jarrod stopped by the hotel to drop off a friend who lived there. According to defendant, they went into the hotel bar to have a drink and say hello to the bartenders, with whom they were friendly. At some point, they unexpectedly encountered Haulmark in the bar. The evidence would support a conclusion that both defendant and Haulmark had been drinking heavily that night. According to defendant, Haulmark challenged him to a fight. Believing that he would wind up having to fight Haulmark whether he accepted the challenge or not, defendant accepted. The two men, accompanied by Jarrod and later joined by Emily, walked out of the hotel. A few minutes later, a bar employee found Haulmark lying on the ground, severely injured. Defendant, Emily, and Jarrod were no longer at the scene.

According to defendant's trial testimony, Haulmark had been the aggressor in the fight. Haulmark advanced toward defendant, tackled him into a raised flower bed, clamped his teeth down on

defendant's right nipple, and started choking him. Defendant testified that he was "fighting for [his] life" because Haulmark outweighed him by eighty pounds and had him in a "strangle hold." Defendant testified that he was lying on his back and fought desperately to escape Haulmark's grip. When he finally got Haulmark off him, defendant kicked him once in the head to keep him from renewing the attack. Defendant stated:

> [H]e tackled me into that flower bed. He bit me. He was choking me. And I started to fight for my life. And . . . I fought with everything that I had. I punched him. I elbowed him. I kneed him. And when he was coming back up, . . . I didn't want him to get back up because he was obviously going to be very angry. And, I -- I was afraid. And I -- I kicked him.

Defendant further explained that he kicked Haulmark, as Haulmark was getting back up, because "he was a very large man and I was scared of him and I was afraid of what he would do to me. So, yes, I did not want him to get back up."[5] There was evidence that Haulmark had been sprayed with pepper spray; the defense version was that Emily sprayed him at the end of the altercation, after which she, defendant and Jarrod left the scene in her car.

---

[5] Haulmark eventually died at the scene, as the result of brain trauma. The State's expert witnesses could not state for certain that Haulmark was kicked in the head more than once and could not identify any one blow as the fatal one.

An examination of defendant's body the day after the fight revealed a human bite mark over his nipple, severe enough to break the skin, and strangulation marks on his neck. There were also signs of disturbance in the mulch of the flower bed, consistent with someone having been pushed into it.

According to defendant, when he accepted Haulmark's challenge he thought they would have an ordinary fistfight, and both men would walk away with no major injuries. Previous fights between them had not resulted in serious injuries. He did not anticipate that Haulmark would try to kill him. Defendant testified that when he left the scene of this fight, he did not realize that Haulmark was seriously injured; he expected Haulmark to be at work the next day. Defendant's statement to the police a day later, made before the police revealed Haulmark's death, reflected that defendant did not know Haulmark was either severely injured or dead.

In addition to the evidence of the prior fights with defendant, and the fight that occurred on August 17, 2008, there was more general testimony that Haulmark had been aggressive and threatening to others at Legends. The Legends bar manager, Vicki Driemel, testified to an incident about a month before the killing, in which Haulmark and a companion told her they belonged to "the pipeline mafia" and threatened to kill her,

harm her children, and burn her house down. Haulmark was banned from the bar for a month as a result of that incident. On the evening of the killing, at about 2:20 a.m., the security camera in the bar recorded an incident in which Haulmark appeared to be physically aggressive toward another man at the bar. Defense witness Gene Cobb testified that Haulmark was hitting the man in the back of the head and trying to get the man to go outside and fight him.

The defense also presented testimony from Jason Ford, a pipeline worker, that at some point prior to the August 17, 2008 incident, Haulmark told Ford and another employee that he was going to "break [defendant's] neck" and "f***" his girlfriend. Ford, who was a friend of defendant, testified that he "relayed that information to [defendant]." Defendant responded that Haulmark and his friends were "a bunch of punks" who called themselves the "pipeline mafia." Defendant also told Ford that Haulmark and his friends "don't ever leave him alone."

Ford testified that as of August 2008, defendant was slightly over six feet tall and weighed about 155 pounds. That was consistent with a police report, prepared shortly after defendant's arrest, which described him as weighing 160 pounds. There was testimony that Haulmark referred to defendant as a

11

"scrawny little bastard." As previously noted, Haulmark was six feet tall, weighed 235 pounds, and was a former linebacker.

II

In State v. Rodriquez, 195 N.J. 165 (2008), our Supreme Court "held that a person who acts in self-defense and 'kills in the honest and reasonable belief that the protection of his own life requires the use of deadly force' cannot be convicted of murder, aggravated manslaughter, or manslaughter." State v. O'Neil, 219 N.J. 598, 601 (2014) (quoting Rodriquez, supra, 195 N.J. at 172). As recently emphasized in O'Neil, the Court has "put to rest the 'mistaken assertion' in State v. Moore, 158 N.J. 292, 303 (1999), that a defendant charged with aggravated manslaughter and manslaughter could not assert self-defense." Id. at 602.

Where the evidence could support self-defense as the justification for a homicide, the trial court must tell the jury that self-defense is a complete defense to aggravated and reckless manslaughter as well as to murder. Rodriquez, supra, 195 N.J. at 174-75. And, the trial court must tell the jury that the State has the burden to disprove the self-defense justification. Id. at 175.

> In considering whether to charge the jury on self-defense, a court should consider the circumstances that might give rise to that defense, including the

12

defendant's and alleged aggressor's conduct, rather than the charges chosen by the prosecutor. The reality of the situation facing the defendant governs whether he had a right to engage in self-defense. As long as a self-defense charge is requested and supported by some evidence in the record, it must be given.

[Id. at 174.]

Where there is sufficient evidence to warrant a self-defense charge, failure to instruct the jury that self-defense is a complete justification for manslaughter offenses as well as for murder constitutes plain error. See O'Neil, supra, 219 N.J. at 617. In O'Neil, the Court found that the defendant's appellate counsel rendered ineffective assistance in failing to bring Rodriquez to our attention, in a case where "the trial court instructed the jury that self-defense was a valid justification for murder but not for aggravated manslaughter or manslaughter." Id. at 602. The Court concluded:

If the jury found that defendant had an honest and reasonable belief that the use of deadly force was necessary to save his own life, that he was not the aggressor, and that he could not have safely retreated, then self-defense applied not only to the murder charge, but also to the aggravated-manslaughter and manslaughter charges. The jury was instructed that self-defense applied to the murder charge and acquitted defendant of that offense. The jury was instructed that self-defense did not apply to the aggravated-manslaughter and manslaughter charges and convicted him of those offenses.

> Of course, we cannot know the precise
> reason for the jury's verdict of not guilty
> to murder. Nevertheless, the trial court's
> failure to charge self-defense on aggravated
> manslaughter and manslaughter leaves open a
> reasonable probability that, if properly
> instructed, the outcome would have been
> different. The erroneous jury instruction
> necessarily undermines confidence in the
> verdict.

[Id. at 617.]

In this case, defendant's primary defense to the killing of the victim was self-defense. The judge instructed the jury that self-defense was a justification for murder, but did not instruct the jury that self-defense was a defense to aggravated manslaughter or manslaughter. The jury acquitted defendant of murder but convicted him of aggravated manslaughter. The State contends that if the charge was erroneous, the error was harmless because the evidence did not support a claim of self-defense. We disagree.

At the charge conference on June 16, 2011, the State argued that the evidence did not support a self-defense charge. In rejecting the State's application to exclude the self-defense issue, the trial judge cogently explained why the evidence could support a claim of self-defense. We agree with his analysis. We add the following discussion.

Pursuant to N.J.S.A. 2C:3-4a, "the use of force upon or toward another person is justifiable when the actor reasonably

believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." However, deadly force may not be used "unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm." N.J.S.A. 2C:3-4b(2). In addition, deadly force is not "justifiable" in a situation where "[t]he actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter." N.J.S.A. 2C:3-4b(2)(a) (emphasis added). Nor is the use of deadly force justifiable where "[t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating." N.J.S.A. 2C:3-4b(2)(b).

There is little case law in this State construing the statute as it applies to the situation presented here. Both parties cite State v. Scaduto, 74 N.J.L. 289, 294 (Sup. Ct. 1907), as standing for the proposition that if two individuals engage in mutual combat, neither of them can claim self-defense. Defendant also invokes Scaduto as standing for the proposition that if one party escalates the fight by using deadly force, the other party may respond defensively with deadly force. We do not find Scaduto particularly helpful with respect to either proposition.

Scaduto did not involve mutual combat that escalated. The defendant there claimed that the victim attacked him first by drawing a gun and shooting at him. Id. at 290. The issue the court addressed on the self-defense charge was the admissibility of evidence that the victim made previous threats against the defendant. Ibid. The court held that, even if the defendant did not know about those threats, they were admissible if there was an issue as to whether the victim was in fact the aggressor in the incident. Id. at 291.

The language in Scaduto concerning mutual combat precluding a self-defense claim was dicta and was not directed at self-defense to a homicide charge. It was part of the court's explanation as to why the trial judge erred, albeit harmlessly, in charging the jury that if the defendant was acquitted of manslaughter, he could still be convicted of fighting by mutual agreement. Id. at 294. At the time, the statute required that both combatants be found "jointly" guilty of that offense. See L. 1898, c. 235, § 40; State v. Jordon, 86 N.J. Super. 585, 590 (App. Div. 1965). The court reasoned that if either party acted in self-defense and was acquitted of manslaughter on that basis, that party could not then be convicted of combat by agreement. Scaduto, supra, 74 N.J.L. at 294. In that context, the court also stated that if the parties agreed to mutual combat, neither

of them could claim self-defense as a defense to the crime of fighting by mutual combat. Ibid.; see Jordon, supra, 86 N.J. Super. at 590-93 (discussing and applying the dicta in Scaduto to a charge of fighting under N.J.S.A. 2A:170-27). Nor is State v. Pasterick, 285 N.J. Super. 607, 616-17 (App. Div. 1995), applicable to this issue, because it addressed mutual combat in the context of passion-provocation manslaughter, not self-defense, and the defendant there admitted to being the aggressor in a fight with his father.

Defendant cites cases from other jurisdictions, e.g., United States v. Lewis, 65 M.J. 85, 88-89 (C.A.A.F. 2007); People v. Quach, 10 Cal. Rptr. 3d 196, 201-02 (Ct. App. 2004); Commonwealth v. Barber, 477 N.E.2d 587, 588-89 (Mass. 1985). Those cases are of somewhat limited utility, because they construe self-defense statutes that are different from New Jersey's statute. For example, the California statute specifically addresses "mutual combat" and sets forth a defendant's four-part proof burden to demonstrate self-defense in that context. Quach, supra, 10 Cal. Rptr. 3d at 200 n.2. However, all of the cases generally discuss the concept that, during mutual combat, a defendant may use deadly force in self-defense when he has not previously used or threatened deadly force against his opponent but the opponent suddenly begins

using deadly force.  See also United States v. Stanley, 71 M.J. 60, 68-69 (C.A.A.F.) (Baker, C.J., concurring), cert. denied, ___ U.S. ___, 133 S. Ct. 210, 184 L. Ed. 2d 41 (2012).  That approach is consistent with New Jersey's statute.[6]

Viewing the evidence in the light most favorable to the defense, defendant did not provoke the fight and certainly did not provoke the fight "with the purpose of causing death or serious bodily harm" to Haulmark.  N.J.S.A. 2C:3-4b(2)(a).  Rather, the 235-pound Haulmark escalated a proposed garden-variety fistfight into a deadly assault on the much smaller defendant, and defendant justifiably resorted to extreme force to save himself from death or serious bodily injury.

Essentially, defendant testified that Haulmark came at him, tackled him, and was then on top of him, biting his nipple and choking him.  Defendant described his desperate attempts to get Haulmark to stop choking him.  Defendant's efforts included repeatedly elbowing and punching Haulmark in the head as Haulmark was clamping his teeth down on defendant's nipple and strangling him.  We agree with the trial judge's conclusion

---

[6] The State's reliance on Commonwealth v. Toon, 773 N.E.2d 993 (Mass. App. Ct. 2002), is misplaced.  In that case, the defendant threatened to stab the victim with a knife before the fight began, and there was insufficient evidence that the victim used deadly force or that the defendant believed he was in imminent danger of death or serious bodily harm.  Id. at 1001-02.

that, if the jury accepted defendant's version of the incident, defendant reasonably believed that he needed to employ the force he used "to protect himself against death or serious bodily injury," and defendant neither provoked the incident nor provoked it "for the purpose of causing death or serious bodily injury" to Haulmark. N.J.S.A. 2C:3-4b(2)(a).

Next, we turn to the requirement that the actor retreat, provided it can be done "with complete safety," N.J.S.A. 2C:3-4b(2)(b). If defendant was being bitten and choked, with Haulmark on top of him, he certainly had no ability to retreat from that situation. See Lewis, supra, 65 M.J. at 89. Once defendant succeeded in getting Haulmark off him, reasonable jurors could conclude defendant was also justified in kicking the large, aggressive Haulmark once as he was getting up, so that defendant and his companions could safely withdraw from the area.

The trial evidence by no means compelled a conclusion that defendant acted in self-defense, but if defendant and the several witnesses who testified favorably to him were deemed credible, a jury could find that he acted in self-defense. Because the evidence could support self-defense, we are

A-2481-11T4

constrained to reverse defendant's conviction for aggravated manslaughter.[7]

Moreover, bearing in mind that the trial judge in this case did not tailor the charge with reference to the evidence presented by either side, we remind the trial court on remand that it is often important to mold jury instructions so that the jury clearly understands how the evidence in this particular case relates to the legal concepts addressed in the charge. See State v. Gartland, 149 N.J. 456, 476 (1997).

> Model jury charges are often helpful to trial courts performing this important function. However, it is not always enough simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime. An instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case.
>
> In this regard, it is "well settled in our State that the trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury * * * the ultimate determination of the facts and the rendering of a just and true verdict on the

---

[7] In arguing for reversal on this point, defendant has raised several additional contentions that were not presented to the trial court. We decline to address them for the first time on appeal. If they are relevant at the retrial they may be raised on remand.

> facts as it finds them." Incorporating specific evidentiary facts into a jury charge is especially helpful in a protracted trial with conflicting testimony.
>
> [State v. Concepcion, 111 N.J. 373, 379-80 (1988) (citations omitted).]

In particular, in this case, it would be helpful to mold the instructions to explain how the self-defense statute applies to the participants in a fight.

## III

We next address the prosecutor's use of the brother's incriminating statement to the police. It is well-established that the prosecution cannot introduce the confession of a non-testifying co-defendant as evidence against a defendant. Bruton v. United States, 391 U.S. 123, 126, 88 S. Ct. 1620, 1622, 20 L. Ed. 2d 476, 479 (1968); State v. Haskell, 100 N.J. 469, 478-79 (1985); State v. Laboy, 270 N.J. Super. 296, 303 (App. Div. 1994). "[T]he out-of-court statement of a co-defendant is inadmissible against another defendant because admission of the statement violates the rule prohibiting hearsay and the defendant's fundamental right to confront witnesses." Haskell, supra, 100 N.J. at 478.

More generally, absent exceptions not present here, a witness's statement resulting from a police interrogation constitutes testimonial hearsay. Crawford v. Washington, 541

U.S. 36, 52, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177, 193 (2004); see Michigan v. Bryant, 562 U.S. 344, ___, 131 S. Ct. 1143, 1150, 179 L. Ed. 2d 93, 101-02 (2011); Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 224, 237 (2006). Unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him, the statement cannot be admitted as evidence against the defendant without violating his Sixth Amendment confrontation right. Crawford, supra, 541 U.S. at 59, 124 S. Ct. at 1369, 158 L. Ed. 2d at 197; State v. Weaver, 219 N.J. 131, 151 (2014).[8] It is also improper for the prosecution to imply to the jury, through argument or witness testimony, that the State has additional incriminating evidence that the jury has not heard. Weaver, supra, 219 N.J. at 152-53; State v. Branch, 182 N.J. 338, 351-52 (2005); State v. Johnson, 421 N.J. Super. 511, 519 (App. Div. 2011).

In cross-examining defendant, the prosecutor clearly transgressed those fundamental constitutional principles. This impropriety was compounded when the judge later allowed the prosecutor to tell the jury that the brother's statement was

---

[8] We agree with defendant that Jarrod's statement to the police was not the statement of a co-conspirator made during the course of and in furtherance of a conspiracy. See N.J.R.E. 803(b)(5). Nor, in a criminal trial, was it admissible against defendant as a statement against interest. N.J.R.E. 803(c)(25).

kept from them by the court's evidentiary rulings. Johnson, supra, 421 N.J. Super. at 518-20.

To put the errors in context, defendant's cross-examination was not the first time the prosecutor made improper use of the statement of an absent witness. During the prosecutor's opening statement, he informed the jury that Emily Henry told the police that she had told defendant that Haulmark made crude gestures and comments to her on the night Haulmark was killed. Thus, the prosecutor argued, defendant was motivated to kill Haulmark due to his rage over the way he believed Haulmark treated the girlfriend. The prosecutor then told the jury that Emily's statement to the police was untrue.

Out of the jury's presence, defense counsel vociferously objected and requested a mistrial, because Emily was not going to be a witness at the trial and her out-of-court statement, that she allegedly told defendant certain information, was inadmissible hearsay. The judge denied the mistrial motion; however, he ruled that the State was to make no further comment to the jury about Emily's alleged statement. That ruling should have enlightened the prosecutor as to the inadmissibility of hearsay statements by absent co-defendants. But it did not.

In response to the prosecutor's opening statement, defense counsel's opening statement reminded the jury that neither his

comments nor those of the prosecutor were evidence, and that "[t]he only evidence you will hear is going to come from this [witness] box, and from exhibits that come from witnesses who are in that box." Defense counsel would repeat that theme in his summation.

During defendant's cross-examination, the prosecutor asked defendant about Emily's "statement." Defense counsel objected and the judge sustained the objection. Soon thereafter, the prosecutor asked defendant a series of questions about whether his brother participated in the fight. Defendant denied that his brother participated. The prosecutor then asked: "Is what you're telling us here today consistent with your brother's statement?" Defense counsel objected and told the judge that this question might be grounds for a mistrial. The judge sustained the objection. However, on the next trial day, the prosecutor renewed his request to use the brother's statement to cross-examine defendant, over defense counsel's objection. The judge ruled that "the State can pursue this line of inquiry."

During the subsequent cross-examination of defendant, one of the prosecutors asked defendant another series of questions about whether his brother participated in the fight with Haulmark, allegedly by elbowing, hitting, and kicking him. Defendant denied it. She then asked, "isn't it true that Jarrod

said that he did?"  Defense counsel objected and, at sidebar, the judge asked the prosecutor to withdraw the question.  She agreed, but clearly, the information was presented to the jury through her questions, and no curative instruction was given.

On June 16, 2011, defense counsel moved for a mistrial based on the prosecutor's conduct.  Defense counsel pointed out that during her cross-examination of defendant, the prosecutor had been reading from a transcript of the brother's statement, and the jury would have received the impression that the brother had made a statement which contained the information on which the prosecutor's questions were based.  The judge denied the motion, stating his belief that the jury had not seen the transcript.

During his summation, defense counsel attempted to address and defuse the potential prejudice posed by the prosecutor's improper effort to place Jarrod's statement before the jury.  He began by arguing to the jury that the minimal bloodstains on Jarrod's pants did not establish that Jarrod participated in the fight with Haulmark.  Defense counsel then pointed out that there was no testimony that Jarrod participated in the incident:

> Now, that's the bloodstains that Jarrod had on him.  You saw how much blood there was on Jacob Gentry's knee, you saw how much blood there was on Jacob Gentry's boot.  Do you think for a minute that Jarrod Gentry was involved in the fight — and remember,

ladies and gentlemen, when we started this case, the judge has already told you, and he's probably going to instruct you as to this again, instructed you at the beginning of the case, . . . what the lawyers say isn't evidence. The only evidence actually comes from this box and from that screen or from the mouth of a witness as they tell you what happened. And did you hear anyone from that witness stand say Jarrod Gentry was involved in this fight, that this was a two on one? You didn't. The State has an obligation to prove their case beyond a reasonable doubt, and you heard nothing about that, not once. Not from a witness, that's for sure.

Before beginning her summation, the prosecutor objected to that statement and argued that "[defense counsel] commented on the State not presenting evidence of Jarrod's testimony and basically said we failed . . . [w]hen, in reality, your Honor precluded us from using it." (Emphasis added). Defense counsel responded "that what I said was they heard no competent evidence from a witness who testified about Jarrod's involvement. And they didn't." Apparently misconstruing, or misremembering defense counsel's summation argument as telling the jury that the State failed to introduce Jarrod's statement in evidence, the judge admonished defense counsel that "this should not have been brought up" because the court had ruled that Jarrod's statement was inadmissible. He granted the prosecutor's request that she be allowed to tell the jury that Jarrod's statement had been excluded by the court.

The prosecutor took full advantage of this ruling, not only telling the jury repeatedly that Jarrod had made a statement, but clearly implying to the jury that the State possessed incriminating evidence that the jury had not been allowed to hear:

> [Defense counsel] made a reference to you, he said the State failed to prove their case . . . because we didn't bring in Jarrod's statement. Well, we did not fail to bring in Jarrod's statement. That was a judicial ruling, the judge made the decision. You heard throughout this whole trial there's stuff that's admissible, there's stuff that's inadmissible. . . . [I]t's up to the judge and all those books that sit up there to decide what is relevant for you to hear and what is not relevant. The State did not fail to do anything and you may not . . . infer, that we neglected to prove our case from failure to give you Jarrod's statement.

We conclude that the prosecutor's questions and summation comments, and the trial court's ruling permitting the comments, were clearly improper, violated bedrock constitutional principles, and constituted prejudicial error. Defendant did not open the door to this evidence, and its admission was plainly erroneous. See State v. Vandeweaghe, 177 N.J. 229, 237-38 (2003); Johnson, supra, 421 N.J. Super. at 519-20; State v. Rucki, 367 N.J. Super. 200, 207-09 (App. Div. 2004).

The State argues that Jarrod's statement was admissible because it only incriminated him. Putting aside the obvious

Crawford issue, which the State does not address, we find the State's argument unpersuasive. Given the issues in this case, if Jarrod admitted participating in the fight, that evidence clearly incriminated defendant. The evidence was admitted in error, and the error went to the heart of the dispute between the defense and the State — whether Haulmark's death occurred as the result of a one-on-one fight or a three-against-one attack. See State v. Smith, 167 N.J. 158, 188 (2001).

The trial errors not only unfairly undercut defendant's credibility but the prosecutor's summation undermined the credibility of defendant's attorney in implying that he misrepresented the evidence. Further, because defendant testified as to all issues, errors that impugned his credibility require that his conviction be reversed as to both counts. See Rucki, supra, 367 N.J. Super. at 208-09.

> **[At the direction of the court, Part IV, which is not deemed to warrant publication, see R. 1:36-2(d), is omitted from the published version.]**

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2481-11T4