**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5050-16T4

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

ROBERT C. MCGRANAHAN,

     Defendant-Respondent.

_____

          Argued October 10, 2019 – Decided February 27, 2020

          Before Judges Nugent, Suter and DeAlmeida.

          On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 13-06-0874.

          Stephen William Kirsch, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan Brody, Deputy Public Defender, of counsel and on the brief).

          Nancy Anne Hulett, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney; Nancy Anne Hulett, of counsel and on the brief).

PER CURIAM

Indicted for murder and a weapons offense, convicted by a jury of the lesser-included offense of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), and sentenced to concurrent prison terms, respectively, of twenty-five years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and four years, defendant, Robert C. McGranahan, appeals. He argues:

> POINT I
> THE COURT ERRED IN RULING THAT THE QUOTE EXCERPTED FROM DEFENDANT'S FACEBOOK PAGE WAS ADMISSIBLE. DEFENDANT WAS THEREBY DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
>
> POINT II
> DEFENDANT'S AGGRAVATED MANSLAUGHTER CONVICTION MUST BE REVERSED BECAUSE THE JUDGE'S FAILURE TO INSTRUCT THE JURY THAT SELF-DEFENSE APPLIES NOT ONLY TO MURDER, BUT TO THAT OFFENSE AS WELL, CONSTITUTED PLAIN ERROR. (Not Raised Below).
>
> POINT III
> THE PROSECUTOR COMMITTED MISCONDUCT BY IMPROPERLY ELICITING TESTIMONY IN ITS CASE IN CHIEF THAT ED DEMKO WAS NOT A VIOLENT OR AGGRESSIVE PERSON (Not Raised Below) AND THAT HE HAD NO CRIMINAL RECORD, ALTHOUGH THE LATTER WAS NOT EVEN LEGALLY PERTINENT INFORMATION.

2

POINT IV
WHEN THE JURY REQUESTED A PLAYBACK OF
DEFENDANT'S CROSS-EXAMINATION, THE
TRIAL JUDGE ABUSED HIS DISCRETION IN NOT
ALSO REQUIRING PLAYBACK OF THE DIRECT
EXAMINATION.

POINT V
THE VERDICT SHEET INACCURATELY
SIGNALED TO THE JURY THAT AGGRAVATED
MANSLAUGHTER WAS A LESS SERIOUS
OFFENSE THAN PASSION/PROVOCATION
MANSLAUGHTER AND THE PROBLEM WAS
EXACERBATED BY THE JUDGE'S RESPONSE TO
A JURY QUESTION, THUS DEPRIVING
DEFENDANT OF HIS CONSTITUTIONAL RIGHTS
TO DUE PROCESS AND A FAIR TRIAL. (Not Raised
Below).

POINT VI
THE 25-YEAR NERA TERM IMPOSED WAS
MANIFESTLY EXCESSIVE. IN ADDITION, THE
TRIAL JUDGE ERRED IN FAILING TO MERGE
THE WEAPON CHARGE INTO THE HOMICIDE
CHARGE FOR SENTENCING PURPOSES. (Not
Raised Below).

The parties do not dispute there was sufficient evidence to warrant a self-defense charge. "Where there is sufficient evidence to warrant a self-defense charge, failure to instruct the jury that self-defense is a complete justification for manslaughter offenses as well as for murder constitutes plain error." State v. Gentry, 439 N.J. Super. 57, 67 (App. Div. 2015). Here, the trial court failed to instruct the jury that self-defense was a complete justification for

3                                                                    A-5050-16T4

manslaughter offenses as well as for murder.  We are thus constrained to reverse and remand for a new trial.

## I.

## A.

The procedural history of this case is not complex.  During the first several hours of a cold March morning in 2013, following a struggle between defendant and Edward Demko in the latter's Sayreville residence, Demko died from knife wounds, one in his chest, one in his back.  Defendant claimed he acted in self-defense and Demko sustained the wounds during a struggle that started when Demko attacked him with the knife.

Following the June 2013 indictment, defendant moved to exclude two posts from his Facebook account.  The court denied his motion as to the first, posted approximately six years before the homicide.  It read: "ENDING ANOTHER PERSON'S LIFE IS NOT A CHOICE.  IT IS A PREREQUISITE TO FEEL ALIVE.  THERE IS NO SECOND OPTION.  Robert McGranahan." The court granted his motion as to the second, a Latin phrase, "Inter Arma Enim Silent Leges."[1]

---

[1] As the court barred admission of the Latin phrase, its meaning is not material to this appeal.  The parties do not appear to dispute its meaning.  According to

Defendant's trial took place in the autumn of 2016. The State contended defendant purposefully murdered Demko. Defendant contended he was defending himself from Demko's attack and the fatal wounds occurred during a violent struggle. Defendant was convicted and sentenced as previously noted, and this appeal followed.

B.

Much of the evidence the parties presented at trial was unrefuted if not undisputed. The central dispute was who started the struggle and who wielded the knife. The trial transcripts contain the following facts.

In March 2013, Edward Demko lived alone in a three-level Sayreville townhouse. He was sixty-three-years old and retired. He was approximately six feet tall, weighed 185 pounds, and was blind in one eye. According to Demko's brother, Demko moved "stiffly" after sustaining injuries in a 2011 motor vehicle accident. Demko's brother testified Demko was never violent or aggressive; rather, if a fight started, Demko was the "first one to try and calm everybody down."

---

a Latin scholar, the phrase is a noted legal maxim that has its roots in the speeches of Cicero. Commonly understood to mean "For in times of war the laws fall silent," its grammatical translation is "For among arms, the laws fall mute."

Defendant was twenty-six years old.  He lived with his father.  On March 8, 2013, between 11:00 p.m. and midnight, defendant saw Demko's profile on a dating website.  Defendant described the website as a "hook[-]up" site for men.  He and Demko conversed online.  Later, at approximately 1:00 a.m. on March 9, 2013, Demko drove in his minivan to defendant's residence and the two returned to Demko's townhouse.

After having a drink and watching a television movie in Demko's second-floor living room, the two went upstairs to a bedroom and had consensual sex.  After returning to the living room to watch another movie, a struggle ensued that culminated in Demko's death.

Following the struggle, defendant ran outside into the freezing weather without his shirt and socks and hid by some trees.  Demko twice attempted to call 9-1-1.  According to the Sayreville Police Communications Operator, the first call was abandoned.  During the second call, the caller attempted to speak but was difficult to understand and appeared to have trouble breathing.  When the operator asked, "where is your emergency?", the caller replied, "I can't, I can't. . . ."  The operator heard a gasp and the call ended.  The operator dispatched an officer to Demko's residence.

A-5050-16T4

The officer who was dispatched to Demko's townhouse found Demko lying on the floor, an eight-inch knife in his left hand, a beeping phone in his right hand. Detecting no vital signs, the officer summoned paramedics, who arrived and pronounced Demko dead at 3:09 a.m.

In the living room, the responding officer observed slash marks in the couch. Pillows on the couch were covered with blood. The carpet was "bunched up" on the floor underneath the coffee table. Two glasses and a beer can were on a table. The officer noted the scene showed signs of a struggle.

Meanwhile, defendant sent a text message and made some cellular phone calls. He sent a text at 2:45 a.m. to a former girlfriend. She testified at trial that she was in Atlantic City when she received the text. She sent a text message asking him to leave her alone. He sent another text, saying he had been stabbed. She called and told him to stop texting her and to go to the police. She said defendant sounded distressed and frantic during the call.

At approximately 3:30 a.m., defendant called a friend. He told his friend he had been in a fight in Sayreville, that he might have stabbed someone, and that he had run outside without wearing his shirt, which had blood on it. Defendant asked for a ride, but his friend told him to call the police. Defendant

said he could not. The friend testified defendant sounded frightened, frantic and scared.

At 4:00 a.m. defendant sent a text message to another ex-girlfriend and asked for help. After several more texts and calls, she answered her phone. Defendant wanted her to get him, saying it was an emergency and he was hurt. She refused. Eventually, defendant's father picked him up and drove him directly to the Old Bridge Police Department.

There, defendant's father told an officer that his son had been beaten at a party in Sayreville. The officer described defendant as shivering and disoriented. He saw blood on defendant's face, hands and pants. Defendant told the officer he met a man online and the man picked him up at home and drove him to an apartment in Sayreville near the Old Bridge border. Defendant said the man wanted to have more sex with him, and he refused, which led to an altercation. The officer requested first aid for defendant, who was transported to a hospital. The officer later learned of the homicide and drove to the hospital to stay with defendant.

The triage nurse in the hospital's emergency room described defendant as alert with dried blood on his face, hands and clothes. Defendant said he had been involved in an assault. When asked about a weapon, he did not say

anything at first, but later told the nurse he had been assaulted by a male partner and he had stabbed his friend. He said his partner had the knife and he had grabbed it during a struggle. The Old Bridge police officer, who had arrived at the hospital, testified he was present when defendant told the nurse that he had been involved in an altercation and said: "I think I stabbed somebody." The nurse did not observe any cuts or wounds on defendant, and he did not report any injuries that required immediate medical attention.

A crime scene investigator employed by the Middlesex County Prosecutor's Office drove to the hospital to collect evidence. Defendant told the investigator he was not injured or in any pain. The investigator observed dried blood on defendant's head, face, hands, and feet. He also observed scratches on defendant's back and inner arm near his wrist, and incised wounds on his hand and a "couple" fingers, but he did not believe they were consistent with the amount of blood on defendant's body. He took swabs and photographs and left.

Scott Crocco, a Major Crimes detective with the Middlesex County Prosecutor's Office, was assigned as lead investigator. He drove to the hospital's emergency room and observed defendant, who "had on a pair of jeans, . . . no shirt, and . . . a pretty good amount of blood on him." The detective did not observe any injuries on defendant. After defendant's discharge, Detective

Crocco escorted him to the Sayreville Police Department, explained his <u>Miranda</u> rights,[2] and interrogated him.

Defendant told Detective Crocco and Sayreville Sergeant Thomas Cassidy that he met Demko on a website. Defendant said Demko picked him up around 12:30 or 1:00 a.m. and drove him to Demko's house. After Demko put defendant's "hoodie" in the downstairs closet, they went up to the second floor. Defendant went into the kitchen to pour himself a glass of vodka and Demko got a beer, and then they watched a movie in the living room. After fifteen or twenty minutes, they went upstairs to a bedroom and had consensual sex. Afterwards, Demko got fully dressed but defendant only put on his pants. They returned to the living room to watch a movie. Defendant poured himself a second drink of vodka.

Demko, however, wanted more sex and asked "over and over," but defendant said no. Demko left the room. Defendant thought he went to the bathroom. When Demko returned, he kept asking for more sex. Defendant said he was sitting on a chair near the couch when Demko walked over to him and tried to unbuckle his pants.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Defendant grabbed Demko's wrist and pushed him away, but Demko "went back at it." He grabbed Demko's wrist again and got up from the couch. He recalled "flailing" his arms as they struggled. Demko hit him "in the head a couple of times" and defendant realized Demko had something in his hands, although he did not initially see a knife. "[T]hat's where everything just got hazy."

Defendant said Demko came at him with the knife. He recalled rolling around on the floor and trying to get Demko off him, and thought he stabbed Demko during the struggle because of the "blood that was on me." He later said he stabbed Demko in the upper body. He did not know where Demko got the knife, but said it was long.

Defendant "broke free" from Demko when they were lying on the floor, grabbed his shoes, and ran outside and hid by the trees. He left his socks, shirt, and "hoodie" in the house. He called his ex-girlfriend and a friend because he was "freaking out" and then he called his brother and parents. His father picked him up and took him to the Old Bridge police station.

Detective Crocco asked defendant how Demko had a knife in his hands while trying to unbuckle defendant's pants. Defendant initially said he thought Demko had the knife in a pocket, but then said "it makes more sense that I must

A-5050-16T4

have picked up the knife first. I -- I'm not sure." When asked where he got the knife, defendant said he did not want to guess. Defendant said the blood on his face, hands and feet got there from wrestling with the victim. When asked why he did not call 9-1-1, defendant said his "first priority was to just get out of there and then -- you know, and then figure it out."

Dr. Andrew Falzon, chief medical examiner for Middlesex County, performed the autopsy. He observed that Demko had two stab wounds, twelve defensive wounds on his hands, and eight other injuries, including abrasions and incised wounds. One stab wound was located in the victim's left upper chest, just below the clavicle, with an entrance point an inch-and-a-half long. Falzon said the knife penetrated six inches through the bone of the second rib, continued into the chest, and punctured the upper left lung, causing blood to collect inside the left chest cavity. He determined the knife went "from front to back, to the right, and downwards" and that the angle of the wound and the fact that the knife cut through bone suggested a "homicidal type injury."

The second stab wound was located in the victim's upper back. This wound penetrated three inches into skin and muscles, passing between the second and third ribs, and ending in the upper part of the right lung. In Falzon's opinion, it was possible that the back wound was made when the perpetrator and

12

the victim were facing each other, with the perpetrator reaching around the victim and "the knife going from back to front, downwards, and to the left."

Falzon examined the knife taken from the victim's hand and testified that it was capable of causing both stab wounds and that its dimensions were consistent with the entrance wounds in the chest and back. He could not determine the order of the stab wounds.

Falzon also found eight incised defensive wounds on the victim's left hand and four on the right hand that were made contemporaneously with the stab wounds. He explained that these incised wounds were caused by the sharp edge of a knife drawn across the surface of the skin. He also found a superficial incised wound on the victim's shoulder and injuries on the victim's face, including above the left eyebrow.

The autopsy confirmed Demko had prior coronary surgery and stent implants, indicating a history of heart disease. A toxicology report showed no evidence of alcohol or drugs in his blood or urine. In Falzon's opinion, the cause of death was the stab wounds to the chest and back, and the manner of death was homicide.

The day after the autopsy, Detective Crocco interrogated defendant again. He and Sergeant Cassidy advised defendant of his <u>Miranda</u> rights, which defendant waived. The statement was audio recorded and played at trial.

Detective Crocco told defendant the autopsy revealed multiple stab wounds and that the angle of the wounds indicated the victim had been sitting when struck by someone above him. He also told defendant that the couch was "all torn up by a knife," after which defendant replied, "It's possible that I lost control." He again told the officers that Demko had the knife.

During his direct examination at trial, Detective Crocco explained that he did a criminal background check of Demko and found no records. In response to a prosecutor's question, the detective said Demko had no arrests for assault or attempted sexual assault charges.

Crocco acknowledged on cross-examination that he viewed defendant as a suspect from the beginning. He did not believe defendant's claim that he was sitting on a chair when Demko came over to him with a knife given the damage and blood on the couch, the lack of any damage to the table, and the fact that neither drink spilled. He also found it unlikely that Demko had taken a knife to defendant in his own house, that Demko had a large knife in his hand when he tried to unbuckle defendant's pants, or that Demko had the knife first. He noted

14 <span>A-5050-16T4</span>

that defendant did not recall seeing any knives in the house, even though there were at least ten near the kitchen stove.

Defendant presented four witnesses and testified himself. He called the crime scene investigator who had observed defendant in the hospital and taken swabs and photographs. The investigator confirmed that a close-up photograph of defendant, taken after the nurse cleaned him, showed scratches and marks on his back and hands, and one below his eye. The investigator also recalled a laceration on defendant's hand and scratches on defendant's inner forearm near his wrist.

Defendant's father testified that when he drove to Sayreville and spoke with his son on the morning of the homicide, his son was very quiet, dazed, shivering, and "half frozen." His son was not wearing anything above his waist, although it was "like 28 degrees" outside. After they got inside his vehicle, defendant's father noticed blood on his son's face and jeans, and suggested they go to the police station. Defendant did not resist. They drove to the Old Bridge police station because it was close to their house.

Later that day, defendant's father spoke with the police. He told the police that his son was not allowed to drink in the house and that he was unaware that his son had left the residence.

Defendant presented the testimony of Eric Wagg, who worked at the New Jersey Division of Criminal Justice in the Regional Computer Forensics Laboratory (RCFL) in Hamilton. On April 8, 2014, he received a request from Detective Crocco to conduct a forensic examination of defendant's computer and the victim's two laptops to find any communication between them through the website, where defendant said he saw Demko's profile. Detective Crocco also asked Wagg to look for evidence showing defendant had expressed an interest in killing someone.

Wagg used search terms such as "murder, stab, kill." He found activity on all three computers for the website, but no communication between defendant and the victim. Wagg also searched defendant's Facebook postings but could not find any evidence that defendant had homicidal intentions.

Defendant next presented the testimony of Frank Petrillo, an investigator, who examined the computer hard drives. He found activity on defendant's computer and Demko's profile on the website where defendant said he first encountered Demko.

Defendant testified. He said he created his Facebook page when he was sixteen years old. It showed that he liked to work on cars, write lyrics, and play chess. About six years before the incident with Demko, he posted a favorite

16

quote, which read: "ENDING ANOTHER PERSON'S LIFE IS NOT A CHOICE. IT'S A PREREQUISITE TO FEEL ALIVE. THERE IS NO SECOND OPTION. Robert McGranahan." He said the quote was inspired by Masashi Kishimoto, "a Japanese Manga," who wrote "cartoons, stuff like that" about magic ninjas. He denied that the quote had anything to do with his state of mind at the time of the incident.

Defendant noted a second quote on his Facebook page, which read: "Inter Arma Enim Silent Leges." He testified that this quote came from an episode of the Star Trek series called "Deep Space Nine." Defendant said he used both quotes to promote a book.

Defendant also had an "author" page on Facebook that contained his writings, including poetry and "raps." This second page also contained his photograph with a "No Fear" tattoo. Defendant said he got the tattoo about a decade earlier and that a T-shirt company used the phrase to promote skateboarding and "BMX'ing," which he used to do.

Defendant testified that Demko's profile on the website where defendant first saw it described Demko as fifty-nine years old, six-feet tall, 190 pounds, and in "good shape." While driving defendant to his house, Demko mentioned that his former partner of forty years had recently died. Defendant said Demko

17

seemed sad and depressed but showed no evidence of any head or neck problems.

At Demko's house, they went into the kitchen where Demko gave defendant a bottle of vodka. Defendant poured a glass and finished it while they watched a movie. He returned to the kitchen and poured himself a second glass of vodka, but never drank it.

Defendant said he saw no signs of Demko's frailty during sex. After returning to the living area, defendant sat on a chair and Demko sat on the couch as they watched television. Demko asked several times for more sex. When defendant said no, Demko got annoyed and went into the kitchen. He came back to the couch, but then got up and walked over to defendant and tried to unbuckle his pants.

Defendant grabbed Demko's wrists and pushed him away, but Demko tried again to unbuckle his pants. When defendant stood, Demko hit him twice in the face. At that time, defendant saw a "shiny metallic object" in Demko's hand. They fell onto the couch and struggled, and then fell to the floor. Defendant remembered flailing his arms, but did not remember taking the knife from Demko or stabbing Demko. He broke free and ran outside. Defendant said he fled because he did not know if Demko was dead and he wanted to escape. He

18

A-5050-16T4

did not call the police because he was on probation and was not allowed to drink, and he needed "a friendly face."

Defendant testified that Demko got the knife, that Demko attacked him, and he defended himself. He told Detective Crocco in his first statement that he might have picked up the knife, but only after Demko dropped it. Defendant did not remember stabbing Demko. He insisted he had no intent to murder him.

Defendant acknowledged that he twice got into trouble with the law. On November 17, 2011, at age twenty-four, he was placed on probation for a fourth-degree crime. On February 28, 2011, he was placed on probation for a third-degree crime and a second fourth-degree crime. Defendant said he was on probation for these crimes on the night that Demko was killed.

II.

On appeal, defendant presents five argument points as reasons his conviction should be vacated and the case retried. Two arguments concern trial evidence. A third concerns the court's instruction to the jury on self-defense. The fourth and fifth involve jury deliberations, specifically, the jury's consideration of a playback of defendant's cross-examination without the direct examination, and an alleged inaccuracy on the jury verdict sheet. We begin with defendant's argument concerning the court's jury instructions.

A-5050-16T4

The trial court delivered its instructions to the jury in four parts: general principles that apply to all criminal cases, general principles concerning consideration of evidence, the elements of offenses and defenses, and principles concerning deliberations. Following its instructions on murder, aggravated manslaughter, and reckless manslaughter, the court explained the elements of possession of a weapon for an unlawful purpose.

Near the end of its instruction on the weapons offense, the court explained

> that for the purposes of this offense if the defendant honestly believed that he needed to use a knife to protect himself, the law does not require that his belief be reasonable. In other words, if the defendant had an honest, though unreasonable belief that he needed to use the weapon to protect himself, this negates the purposeful mental state required for this offense.

Distinguishing the state of mind required for the weapons offense from self-defense, the court stated, "Now, later on in the charge I am going to instruct you on the concept of self[-]defense as it applies to the offense of murder."

When the court concluded its charge on the weapons offense, the court stated: "Now, we know that the indictment charges Mr. McGranahan with having committed the crime of murder. Right? Mr. McGranahan contends that if the State proves he used or threatened the use of force upon Edward Demko, that such force was justified or justifiably used for his self[-]protection." The

20

court then explained the elements of self-defense to the jury. The court never told the jury that self-defense was a complete justification for manslaughter as well as for murder.

Defendant asserts the trial court's failure to "tell the jury that self-defense is a complete defense to aggravated and reckless manslaughter as well as to murder," as required by Gentry, 439 N.J. Super. at 67, is plain error that requires reversal and a new trial. Notwithstanding Gentry's holding, the State argues the trial court's omission does not constitute plain error. The State concedes self-defense "had to be charged in this case due to defendant's admissions to police and to other witnesses and based upon his trial testimony." It adds, however, "it was a very weak case for self-defense."

The State emphasizes that in summation, defendant argued to the jury that the case was about self-defense and who pulled the knife first. The State also emphasizes that "[n]owhere in defense counsel's lengthy summation was there any intimation that self-defense only applied to a purposeful or knowing act." Rather, "[t]he State argued that defendant stabbed the victim for no reason and it was not self-defense." The State adds it "never argued that self-defense only applied to purposeful or knowing murder." Last, the State contends "the reversal

in <u>Gentry</u> was based not only on the trial court's self-defense charge, but also on other 'serious trial errors.'"

Clear and correct jury instructions are essential to a defendant's right to a fair trial.  <u>State v. Rodriguez</u>, 195 N.J. 165, 175 (2008).  The instructions must plainly spell out how the jury should apply the law to the facts of the case.  <u>State v. Concepcion</u>, 111 N.J. 373, 379 (1988).  An erroneous jury charge is a "poor candidate for rehabilitation under the plain error theory."  <u>Rodriguez</u>, 195 N.J. at 175 (quoting <u>State v. Jordan</u>, 147 N.J. 409, 422 (1997)).

In <u>Gentry</u>, we noted that "[i]n <u>State v. Rodriguez</u>, 195 N.J. 165 (2008), our Supreme Court 'held that a person who acts in self-defense and "kills in the honest and reasonable belief that the protection of his own life requires the use of deadly force" cannot be convicted of murder, aggravated manslaughter, or manslaughter.'"  439 N.J. Super. at 67 (quoting <u>State v. O'Neil</u>, 219 N.J. 598, 601 (2014)).  We further noted, "[a]s recently emphasized in <u>O'Neil</u>, the Court has 'put to rest the "mistaken assertion" in <u>State v. Moore</u>, 158 N.J. 292, 303 (1999), that a defendant charged with aggravated manslaughter and manslaughter could not assert self-defense.'"  <u>Gentry</u>, 439 N.J. Super. at 67 (quoting <u>O'Neil</u>, 219 N.J. at 602).  Consequently, "[w]here the evidence could support self-defense as the justification for a homicide, the trial court must tell

22

the jury that self-defense is a complete defense to aggravated and reckless manslaughter as well as to murder." Ibid. In cases where the evidence warrants self-defense, "failure to instruct the jury that self-defense is a complete justification for manslaughter offenses as well as for murder constitutes plain error." Ibid.

We are unpersuaded by the State's argument the trial court's failure to charge as directed by Gentry is not plain error. We reach that conclusion for several reasons. First, that defendant and the State did not emphasize in their closing arguments the trial court's omission cannot substitute for clear jury instructions that should have been given. It is the function of the court, not advocates in a cause, to instruct the jury on legal principles they must apply to the facts to reach a fair and just verdict.

The State's argument that "nowhere in [the court's] charge on self-defense was there an instruction that self-defense did not apply to manslaughter charges" is also unavailing. The court expressly instructed the jury that self-defense applied to murder. The State's argument, considered in its entirety, is based on extracting parts of the jury charge from their context and crafting from the extractions an argument the jury likely inferred correct principles of law even though such principles had not been explained by the court. Such an argument

is contrary to the settled principles that clear and correct jury instructions are essential to a defendant's right to a fair trial, <u>Rodriguez</u>, 195 N.J. at 175, and must plainly spell out how the jury should apply the law to the facts of the case, <u>Concepcion</u>, 111 N.J. at 379.

Last, we reject the State's argument that the holding in <u>Gentry</u> concerning proper instructions on self-defense did not in and of itself require reversal. That overlooks the language in <u>Gentry</u> that the other errors, "viewed either separately or in combination with the charging error, <u>also</u> require reversal." <u>Id.</u> at 62 (emphasis added).

In rejecting the State's arguments, we are not insensitive to the time, resources, and emotional toll another trial will take. But <u>Gentry</u>'s holding makes clear the omission in this case is plain error. We are thus constrained to reverse and remand for another trial.

### III.

### A.

Because the matter must be tried again, we briefly address some other argument points defendant raises. We first address the admission at the new trial of defendant's Facebook quote concerning ending another person's life. Certainly, one can question whether a six-year-old Facebook post, which

arguably may have been some form of artistic expression, had any relevance to the facts of this case. This is even more so in light of the jury's apparent rejection of the evidence as indicative of defendant's state of mind, at least as to knowing or purposeful murder. Nonetheless, the trial court is better suited than we are to make that determination.

Should the trial court admit the evidence—and we are not suggesting it should—the court should instruct the jury on the limited use it may make of this statement, State v. Barden, 195 N.J. 375, 390 (2008), and tell the jury "precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." State v. Marrero, 148 N.J. 469, 495 (1997) (quoting State v. Cofield, 127 N.J. 328, 341 (1992)).

Defendant argues the admission of the Facebook quote was compounded by the prosecutor's use of it. Here are some examples of the prosecutor's questions to defendant:

Q. Mr. McGranahan –

A. Good morning.

Q. – did it make you feel alive?

A. No.

Q. When you stuck the knife into Edward Demko, into his back and into his chest, this knife, sir, did it make you feel alive?

A. No.

Q. Because that's what your Facebook post said; right, sir? Ending another person's life is not a choice.

Defense Counsel: Your Honor, I'm objecting –

Q. It's [a] prerequisite to feel alive.

We are not insensitive to defendant's argument the prosecutor asked argumentative questions to inflame the emotions of jurors. In those rare instances when a prosecutor disregards the duty "not to obtain convictions but to see that justice is done," State v. Smith, 212 N.J. 365, 402-03 (2012), out of either maleficence or ignorance, there may indeed be a need for a trial court's intercession. Seldom is there any other consequence for such conduct. Nevertheless, the judge presiding over the trial is best situated to access the impact of such conduct and take appropriate action, when necessary.

We note here that when the complained-about questioning occurred, defendant did not object to the questions but rather to the prosecutor wielding a bloodstained knife, thus undermining his appellate argument that the prosecutor's questions were unduly prejudicial. We are confident the trial court will intercede to curb any blatant instances of prosecutorial overzealousness, the

26

need to do so to be gauged in part by the presence or absence of a timely defense objection.

B.

Defendant also argues the court erred by permitting the State to elicit improper evidence of the victim's character for non-violence and testimony the victim had no criminal record. The timing and form of the testimony, elicited from Demko's brother and a law enforcement officer, may have been improper. The impropriety, however, was insignificant, which perhaps explains why defendant did not object. Nonetheless, we direct the parties' attention to N.J.R.E. 404(a)(2) and 405, which should guide them as well as the trial court when the matter is retried.

C.

With the possible exception of the jury requesting a playback of testimony, it is unlikely any of the other errors alleged by defendant will recur. In the event of a request for a playback of testimony, the parties should abide by the Supreme Court's pronouncement in State v. A.R., 213 N.J. 542 (2013).

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5050-16T4