STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CALVIN BESS, DEFENDANT-APPELLANT.

Argued October 8, 1968—Decided November 25, 1968.

*Mr. Calvin J. Hurd* argued the cause for defendant-appellant.

*Mr. Arthur J. Timins,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney; *Mr. Arthur J. Timins,* Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

PROCTOR, J. Defendant Calvin Bess was convicted of murder in the second degree for the fatal shooting of James W. Grunden. He was sentenced to ten to fifteen years in State Prison. He appealed directly to this Court challenging his conviction and sentence.

The objective facts of the homicide are virtually undisputed. The defendant, age eighteen, was employed as a bartender at the Club Supreme, a tavern in Elizabeth. On December 11, 1966, in midafternoon, the decedent Grunden was a patron sitting at the bar. Two men and a woman employee were also sitting at the bar. They testified for the State and their versions of the homicide were substantially in agreement. Grunden ordered a drink of whiskey and gave the defendant one dollar, receiving 40 cents in change. Grunden said: "What are you doing, cheating me again, huh? Joe only charges me 50 cents." He finished the drink and ordered another, saying that he did not have 60 cents but that he would pay only 40 cents. The defendant told him that he could not charge less than 60 cents, and that if he wanted to complain he should wait until Joe Adair, the owner, returned. Grunden then said that he would pay 55 cents and he placed some change on the bar. The defendant said: "Joe gives us a set price. We have to charge what he said. I can't give you a drink for 55 cents. The drinks are 60 cents." Grunden then got up from his seat and hitting the bar with his fist said: "I will come back there and take my drink." The defendant said: "You can't do that." Grunden replied: "Oh, no?" or "Well, I am coming." He then started to walk toward the entrance to the inside of the bar. At this point defendant's manner was "courteous" and his voice was "quiet," while Grunden's voice was "sort of

raspy." When Grunden was almost to the entrance to the bar, the defendant took a pistol from behind the cash register. The owner of the bar, Adair, had a permit to possess the gun. As Grunden began to enter the inside of the bar the defendant, now carrying the gun, walked toward him and said: "Don't come back here. I mean it." Grunden replied: "That don't stop me" or "That gun don't scare me." He then entered the rear of the bar.

After the defendant picked up the gun and during the ensuing conversation, he was walking toward the bar entrance to which Grunden was walking at the same time. The witnesses were in disagreement about the distance covered by the defendant, variously describing it as eighteen or nineteen feet, twelve feet, and six or seven feet. He walked "sort of slow," carrying the gun "down" in his hand. Grunden came behind the bar and the two men walked toward each other. When they met Grunden "nudged" the defendant with his "right elbow." As to the force of the collision one witness said that "you can feel it with the contact that he [Grunden] gave him, you know." There was testimony that after coming in contact with each other the defendant stepped back and the gun was discharged. At the time Grunden was three or four feet inside the bar. He died as a result of the shot. After the shooting the defendant replaced the gun behind the cash register and gave 10 cents to one of the witnesses to telephone the police, who responded to the call almost immediately. The defendant made no attempt to escape and cooperated with the police investigation.

The defendant was described as being small, weighing approximately one hundred and fifty pounds. It was stipulated that the decedent was six feet and one inch tall, weighing two hundred and seventy-five pounds and was thirty-one years old.

In his defense Bess testified that he was not acquainted with Grunden, although he had seen him on two prior occasions. His testimony as to the shooting did not ma-

terially dispute that of the State's witnesses. When asked why he picked up the gun, he answered: "To be frank, I picked it up, I figure if he see it, he would not come behind the bar." He testified that he was "bewildered" when Grunden said he was coming behind the bar because he had never heard anyone say that before. When Grunden told him that the gun would not stop him he became afraid: "Well, at that point, seems like my stomach had arouse to my throat and seemed like it was choking." After they collided he said that Grunden reached for his hands, knocking him off-balance and as he stepped back he heard the gun go off; that he at no time intended to shoot Grunden, nor did he recall having pulled the trigger.

When asked why he did not retreat instead of advancing toward Grunden, the defendant answered: "I couldn't tell you I didn't back up or why I stayed there because, really, I don't know, it was just funny. * * * I don't know why I did walk, to tell you the truth." He denied that he walked toward Grunden for the purpose of shooting him.

The principal of the junior high school in Elizabeth that defendant had attended testified the defendant had an over-all I. Q. of 66 but that his citizenship qualifications were considered average or above average. Dr. David M. Fink, a psychologist, testified on defendant's behalf. He said that as a result of psychological tests administered to Bess, he found that the defendant was "an emotionally unstable, immature individual whose thinking is often childish." Dr. Fink placed Bess's intelligence in the "dull-normal" range below a sixth grade level, concluding that "he can become confused and almost disorganized with pressure."

After the defendant rested the State called a firearms expert in rebuttal who testified that the gun would not discharge until at least four and a half pounds of pressure had been placed on the trigger.

On this appeal defendant contends that some opinion testimony given by Dr. Fink in the absence of the jury was later

improperly excluded from the jury's consideration. (In fact, however, Dr. Fink's statement that Bess "can become confused and almost disorganized with pressure" was to the same effect.) He argues that the jury should have been permitted to consider what appeared reasonable to "Bess (not the theoretical reasonable man)" at the time of the shooting in order to protect himself or prevent a robbery. For this reason he urges that Dr. Fink should have been allowed to testify at length that Bess would tend to "overreact" to protect himself. His brief reveals that he felt this testimony would have been excluded if offered.

Justification for a killing in self defense or to prevent a robbery, however, depends on the jury's determination of what they think a reasonable man would have done under the circumstances. This objective test, rather than a subjective exploration of Bess's psyche has been the standard for justifiable homicide consistently applied in this state. *State v. Brown,* 46 *N. J.* 96, 102 (1965) ; *State v. Fair,* 45 *N. J.* 77, 91 (1965) ; *State v. Hipplewith,* 33 *N. J.* 300, 317 (1960) ; Perkins, *Criminal Law* (1957) *pp.* 884–86.

In *State v. Sikora,* 44 *N. J.* 453 (1965), in reviewing a conviction of murder in the first degree, this Court examined at length, and rejected as unworkable, any psychiatric theory of human behavior which would necessitate abandoning the objective standard of criminal responsibility. The Court said :

"Criminal blameworthiness cannot be judged on a basis that negates free will and excuses the offense, wholly or partially, on opinion evidence that the offender's psychological processes or mechanisms were such that even though he knew right from wrong he was predetermined to act the way he did at that time because of unconscious influences set in motion by the emotional stresses then confronting him. In a world of reality such persons must be held responsible for their behavior." *Id.,* at *p.* 470.

Any challenge to the above thesis on the ground that in a first degree murder case a proper finding of premeditation

and deliberation requires the admission of any non-speculative evidence which rationally bears on defendant's subjective mental processes, *cf. State v. Di Paolo,* 34 *N. J.* 279, 295 (1961), is mooted in this case by the jury verdict of murder in the second degree. See *State v. Moynihan,* 93 *N. J. L.* 253, *pp.* 256–257 (*E. & A.* 1919).

 In sum, since the standard to be followed is what a reasonable man would have done under the circumstances, psychological evidence as to Bess's possible overreacting was not relevant to the jury's determination of second degree murder, and thus the defendant was not prejudiced. The jury, as the representative of society, and not the defendant, determines what is reasonable under the circumstances. This is so because society has a vital interest in maintaining minimal standards of behavior for the protection of human life. In any event, any possibility of error in this regard was precluded by Dr. Fink's testimony as to defendant's emotional instability under pressure.

 Defendant further contends that he was prejudiced by the court's charge that proof of an unlawful homicide, which had already been defined by the court, gives rise to a presumption of murder in the second degree. He argues that any instructions on such a presumption erroneously shifted the burden of proving justification onto the defendant. We do not agree. When the evidence could reasonably support a conviction for murder and there is proof that "the killing was not accidental, justified or excusable, or manslaughter," see discussion in *State v. Gardner,* 51 *N. J.* 444, 459 (1968), the crime is presumed to be murder in the second degree. An instruction to this effect is for the benefit of the defendant, placing an increased burden on the State to elevate the degree of homicide. *State v. Brown,* 46 *N. J.* 96, *pp.* 105–108 (1965). The jury must be instructed that before a presumption of second degree murder can arise, they must first be convinced that there was a murder. When the State is seeking a conviction on any of three degrees of homicide,

*viz.*, first degree murder, second degree murder, or manslaughter, the trial judge must use care in defining the distinguishing elements in each of the three offenses. He must as well make clear to the jury that the State has the burden of proving beyond a reasonable doubt all elements of each crime. In the present case the trial judge explained to the jury at length that the State had the burden, which never shifted, of proving the guilt of the defendant beyond a reasonable doubt. He said that the State's burden "is an ultimate one surviving all others." He also adequately defined all three degrees of homicide. In viewing the court's charge in its entirety, we conclude that the jury was adequately instructed, and that the benefit to the defendants which resulted from the charge with respect to a presumption of second degree murder ws not dissipated by any other part of the charge. See *State v. Hipplewith, supra,* at *p.* 317.

 The other points raised by defendant for reversal require no discussion as they are clearly without merit. However, we are convinced that under the circumstances defendant's sentence to prison for a term of not less than ten nor more than fifteen years was unduly severe and should be reduced. It is settled in this state that an appellate court has the power to review any exercise of the trial court's discretion, including the power to revise a prison sentence where it is manifestly excessive, even though within statutory limits. *State v. Laws,* 51 *N. J.* 494, 498–501 (1968); *State v. Johnson,* 67 *N. J. Super.* 414, 432 (*App. Div.* 1961). See *State v. Brown, supra,* 46 *N. J.,* at *p.* 108; *State v. Tyson,* 43 *N. J.* 411, 417 (1964), *cert.* denied, 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965); Mueller, *Penology on Appeal: Appellate Review of Legal but Excessive Sentences,* 15 *Vand. L. Rev.* 671 (1962). The statute permits a sentence for second degree murder of up to thirty years, with no minimum requirement (*N. J. S.* 2A:113–4). The trial judge's broad discretion under the statute requires that an appellate court give particular scrutiny to the sentence so

that the punishment imposed is not greater than ought to be inflicted under the circumstances of the case.

Defendant's pre-sentence report indicates that he has no prior criminal record, and comes from a good family. The school principal testified as to Bess's good citizenship. Defendant, a young man, was confronted with a situation he did not seek. He was in charge of the place and was suddenly met with the unusual behavior of the deceased, presenting a challenge unfamiliar to him. Defendant reacted to the shooting by immediately summoning the police, and he cooperated fully with the investigation. Although the killing came within the ambit of second degree murder, as the jury found, yet the degree of moral culpability is tempered by the above facts, and they as well reflect upon a sentence suitable for the punitive and rehabilitative objectives involved.

The trial judge concluded that "he will not receive any maximum sentence," and "with proper guidance and counseling he can be returned to the community as a contributing citizen, I hope." While we agree with the trial judge that Bess is a fit subject for rehabilitation, considering all the circumstances, it is our conclusion that ten to fifteen years of guidance and counseling in prison is manifestly excessive. We think that the demands of our penal policy which aim at the prevention of crime and the rehabilitation of the defendant will best be served if his sentence is modified to no more than five nor less than two years.

The judgment below is affirmed except as modified.

*For affirmance as modified*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.