STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
GENE DUNBAR, DEFENDANT-APPELLANT.

Argued December 2, 1975—Decided February 5, 1976.

*Mr. James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for defendant-appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Solomon Forman,* First Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Richard J. Williams,* Atlantic County Prosecutor, attorney).

The opinion of the Court was delivered by

SULLIVAN, J.   Defendant was found guilty of second degree murder in the shotgun slaying of the husband of a girl he was dating.  *N. J. S. A.* 2A:113-1 and -2.  He was sentenced to a term of 15-20 years in New Jersey State Prison for this offense.  He was also found guilty of possession of a shotgun without first having obtained a firearms purchaser identification card, a violation of *N. J. S. A.* 2A:151-41(b).  He was sentenced to 1-2 years in New Jersey State Prison on this offense, the sentence to run concurrently to the sentence for murder.  The Appellate Division upheld his conviction and sentence.  This Court granted certification, 68 *N. J.* 147 (1975), to consider only the claim of excessive sentence.  We affirm.

Defendant, then 19 years of age, was a high school classmate of a girl who was married but estranged from her husband.  About a week prior to the tragic event hereinafter described, defendant attended a graduation party given by the girl.  A romance apparently blossomed and the two began to see each other on a daily basis despite warnings by the husband that he would not tolerate such conduct.  On two occasions the husband actually assaulted defendant when he found defendant in his wife's company.  Instead of avoiding an inevitable confrontation, defendant made another date with the girl and armed himself with a sawed-off shotgun which defendant testified was for his own protection.  As defendant and the girl were leaving the apartment building where she lived, using the rear entrance, the husband intercepted them.  The girl ran back into the building to get help.  In the meantime, the husband approached defendant who took the gun out from underneath his clothing, pointed it at the husband and warned him to stay back.  When the husband did not stop defendant fired a warning shot towards the ground.  The husband kept coming and defendant fired a second shot which struck decedent in the chest.  Defendant said that he intended to shoot the man in the leg, but that

as he fired he tripped over a jacket he had dropped and was actually falling down when the second shot was fired.

The trial judge called the killing a cold-blooded murder. While we do not subscribe to this characterization, it is clear that defendant persisted in a course of conduct with a married woman which defendant knew would result in a confrontation with her husband. He prepared himself for that confrontation by arming himself with a sawed-off shotgun. The tragic result was the killing of the husband.

Defendant was a 19-year-old student at the time, with no prior record of any kind. The sentencing judge recognized this but felt that defendant had to be punished for taking a man's life. In the circumstances, it has not been shown that the sentence imposed was manifestly excessive or unduly punitive.

We were informed at the oral argument of this appeal that defendant has been administratively transferred to the prison farm at Leesburg, a minimum security facility, to serve his sentence, and that he will become eligible for parole in October 1976.

Affirmed.

PASHMAN, J. (dissenting). Defendant Gene Dunbar was convicted for the murder of one Basil Davies in Atlantic City and for possession of a firearm without a purchaser identification card. Both charges arose from the same June 24, 1972 incident. As a result of his convictions, he received concurrent terms of 15 to 20 years for the second degree murder conviction and 1 to 2 years for the possession charge. In an unreported opinion which considered a number of issues, the Appellate Division affirmed the conviction and concluded that the sentence was not "manifestly excessive." This Court granted defendant's petition for certification to consider only the excessive sentence claim. 68 *N. J.* 147 (1975). Looking to this limited issue, we must consider whether the imposition of the joint sentences constituted an "abuse of discretion" on

the part of the trial judge. *State v. Tyson*, 43 *N. J.* 411, 417 (1964), *cert.* den. 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965); see *State v. Allen*, 104 *N. J. Super.* 187, 189–90 (App. Div. 1969), aff'd 54 *N. J.* 311 (1969).

The murder of Basil Davies followed a series of related incidents primarily involving Davies, his wife Marjorie Davies and the defendant. At the time of the murder, Davies had been separated from his wife for approximately three weeks and defendant had been dating her for about 10 days. Defendant had known Marjorie Davies in high school; his association with the victim had begun when they were young children as next-door neighbors, and had continued for 16 years.

The first confrontation between Davies and defendant occurred on Monday, June 19, 1972 when Davies, seeing defendant enter Marjorie's apartment building, accosted Dunbar and warned him not to visit her. The following day Davies again stopped Dunbar in front of the apartment building and seized him by the collar. A security guard had to separate them. On Thursday, Davies telephoned defendant and threatened him; specifically, Davies warned Dunbar that he "meant business" and would "do him in." Later that day, Davies began to follow defendant in his car.

On Friday, the day before the murder, defendant and Marjorie were attending a movie together when Davies entered the theatre, sat down behind defendant, and threatend him with a bottle. Davies and his wife then went out to the lobby "to talk," and were followed several minutes later by defendant. Once in the lobby, Davies pushed his wife against the wall and then assaulted Dunbar, knocking him to the floor and rendering him unconscious for a short while. Saturday afternoon, Davies again telephoned defendant and threatened him.

On the evening of Saturday, June 24, 1972, defendant and Marjorie made plans to attend the movie which they had tried to see the previous evening. Dunbar met Marjorie

in the lobby of her apartment building and at approximately 9:00 P.M., he, Marjorie, her brother Nathaniel Sheffield and defendant's friend Bruce Agard started to leave through the back door of the high-rise apartment building. As they passed through the doors of the building, they saw Davies walking toward them. Marjorie and the others fled back into the building; defendant, who had told Marjorie to get a policeman he knew was in the building, remained on the concrete entrance ramp.

As Davies approached, Dunbar told him, "Stay back. I got a gun." When Davies continued to walk toward him, Dunbar revealed a sawed-off shotgun which he had hidden under his dashiki. Defendant testified that he had planned to use the gun only to frighten Davies. When this failed, defendant again pointed the weapon at Davies and told him to stay back. When Davies did not, Dunbar fired a shot into the ground. Davies continued in defendant's direction. Dunbar then fired a second shot, intending to hit the victim in the leg. However, as he fired, defendant tripped over his jacket which had fallen to the ground. The shot struck Davies in the chest, and killed him. Dunbar fled.

Dunbar was arrested at about 10:00 P.M. that same evening as he returned to the scene of the crime. At the arresting officer's request, defendant led the policeman to the place where he had hidden the shotgun.

Dunbar was 19 years old at the time of the shooting. He was a college student and during the summer vacation was employed in two regular jobs, working for the United Parcel Service from 4:00 A.M. to 8:30 A.M. and as an engineering assistant from 9:00 A.M. to 4:30 P.M. Although married, defendant was separated from his wife and was living with his mother. He possessed above average intelligence, had completed a year at Drexel University and had been attending Atlantic County Community College. He had no prior criminal record. The probation officer found his attitude to be cooperative.

In sentencing Dunbar, the trial judge admitted that defendant was young and based upon his desire for further education was "on the way to rehabilitation." Nonetheless, the judge imposed a lengthy prison term due to the seriousness of the crime, which he characterized as a "cold blooded murder" committed "for no reason at all."

The majority today affirms stating that while it does not subscribe to the trial judge's characterization of the crime, "[i]n the circumstances, it has not been shown that the sentence imposed was manifestly excessive or unduly punitive." *Ante* at 335. I disagree.

I find the characterization by the trial court to be improper and inaccurate and, consequently, an inappropriate consideration in sentencing defendant. Although the jury was charged as to both first and second degree murder, it returned a verdict of second degree murder. This verdict which is inconsistent with the presence of "premeditation" and "deliberation," the distinguishing features of first degree murder, *N. J. S. A.* 2A:113–2, contradicts the judge's portrayal of the crime as a "cold blooded" murder. *N. J. S. A.* 2A:113–2. *State v. Washington,* 60 *N. J.* 170–172 (1972); *State v. DiPaolo,* 34 *N. J.* 279, 294–95 (1961), *cert.* den. 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). The verdict necessarily implies that defendant's crime was a homicide committed with malice but *without* premeditation and deliberation. Therefore, in light of the circumstances of the case and the verdict, the sentence appears to be excessive.

Several other factors support a reduction of defendant's sentence. As noted above, the standard of review for excessive sentence claims is set forth in *State v. Tyson, supra.* An appellate court has the power to review any exercise of the trial court's discretion. *State v. Bess,* 53 *N. J.* 10, 18 (1968); *State v. Spinks,* 66 *N. J.* 568, 573 (1975); *State v. Laws,* 51 *N. J.* 494, 498–501 (1968), *cert.* denied, 393 *U. S.* 971, 89 *S. Ct.* 408, 21 *L. Ed.* 2d 384 (1968). In order to reduce a sentence, an appellate court must find that

the sentence was so excessive as to constitute an abuse of discretion on the part of the trial judge. The imposition of a sentence which is less than the statutory maximum that could have been imposed does not preclude a finding that it is excessive. *State v. Montague,* 55 *N. J.* 387, 407 (1970). In applying this standard, we have suggested that punishment perform one or more of the following legitimate functions: retribution, rehabilitation, deterrence and protection of society from dangerous persons by sequestration of the individual. *State v. Ivan,* 33 *N. J.* 197, 199 (1966). Of these functions, retribution is the least favored; present day thinking by comparison emphasizes deterrence and rehabilitation. *Id.* at 199–200. Utilizing these policy guidelines as a polestar, I find it difficult to justify the imposition of a 15 to 20 year prison term in this case.

First, with regard to the protection of society, it appears that defendant's crime was an isolated response to a peculiar set of incidents, and defendant poses no prospective threat to society at large. The absence of a prior criminal record suggests that defendant has had no propensity towards criminal activity; nor is there any basis for hypothesizing such a tendency in the future.

Second, the fact that this crime is an isolated event, with "strong emotional roots," rather than a more generalized public problem, *State v. Ivan, supra,* 33 *N. J.* at 202, also mitigates against this sentence serving as a deterrent to future crimes. In any event, the imposition of a lighter sentence would adequately fulfill this function.

Third, with respect to another of these functions, the trial judge admitted that the defendant was "on his way to rehabilitation." Where the offender is young, as here, the law places particular importance on rehabilitation as opposed to the companion purposes of retribution and deterrence. *State v. McBride,* 66 *N. J.* 577, 580 (1975); *State v. Ward,* 57 *N. J.* 75, 82 (1970). By attending college while concurrently employed at two jobs, Dunbar had demonstrated a willingness to assume adult responsibilities. Un-

der such circumstances, there is a strong possibility that extended incarceration will do more harm than good by isolating him from society and deferring his career development for a lengthy period of time. See *State v. Ward, supra* at 93. In this regard, I repeat what Justice Jacobs said in his concurring opinion in *State v. Velasquez,* 54 *N. J.* 493 (1969):

. . . the defendant had had no previous involvement with the law and there was every likelihood that he had learned his lesson and would thereafter be fully law-abiding; he noted that the blow to the defendant and his family would be far more devastating than any "problematical incidental damage" to organized gambling; . . . not only would the defendant not come out of State Prison a better man, but, to the contrary, the miracle would be if he did not come out "a much worse one, embittered by what must appear to him to be a savage sentence." 104 *N. J. Super.*, at 584–85. See Hammer, "Role Playing: A Judge Is a Con, A Con Is a Judge," N. Y. Times, Sept. 14, 1969 § 6 (Magazine), at 56; *Menninger, The Crime of Punishment* 73 (1968). [54 *N. J.* at 493–94].

Finally, it is apparent from the trial judge's comments regarding the crime, that he imposed sentence in this case primarily as a form of retribution. The majority recognizes this fact when it says, "[t]he sentencing judge . . . felt that defendant had to be punished for taking a man's life." It cannot be doubted that, though this murder is more the product of disastrously poor judgment than a depraved spirit, it must not go unpunished. Nevertheless, I question the need and propriety of imposing such a stringent sentence. The degree of moral culpability should be tempered by the facts in this case. I find the sentence to be counterproductive and manifestly excessive. I firmly believe that young Dunbar will leave prison mentally and emotionally mutilated after serving a 15–20 year sentence.

The case of *State v. Bess,* 53 *N. J.* 10, presents an analogous situation and, hence, an appropriate precedent for the instant case. There, defendant Bess was working as a bartender when a patron became angry about the price of his drink. Although defendant remained courteous, the victim

became increasingly agitated until finally he started to walk to defendant's side of the bar, ostensibly to get his own drink. Bess became frightened and grabbed a pistol from behind the cash register. Defendant and the victim began to walk toward each other despite defendant's warning to the patron to withdraw. Suddenly the pistol was discharged and the patron was killed. Bess was convicted of second degree murder; he received a sentence of 10 to 15 years in State Prison. Our Court reduced this sentence to no more than five nor less than two years.

As in the instant case, the defendant in *Bess* was young (18 years old), had no prior criminal record, was employed, cooperated fully with the police and "was confronted with a [tense] situation he did not seek." 53 *N. J.* at 19. Both Bess and Dunbar had some reason to fear for their safety, although both should have retreated. Dunbar might be considered more culpable than Bess since, being an intelligent person, Dunbar made a more deliberate choice to confront the victim. I find this distinction to be insufficient to justify the sentence imposed. In any event, it should be noted that while Bess had actually walked toward the victim, Dunbar did not. As the Court concluded in *State v. Bess, supra*:

It is settled in this state than an appellate court has the power to review any exercise of the trial court's discretion, including the power to revise a prison sentence where it is manifestly excessive, even though within statutory limits. *State v. Laws*, 51 *N. J.* 494, 498–501 (1968) ; * * * * Although the killing came within the ambit of second degree murder, as the jury found, yet the degree of moral culpability is tempered by the above facts, and they . as well reflect upon a sentence suitable for the punitive and rehabilitative objectives involved. * * *

We think that the demands of our penal policy which aim at the prevention of crime and the rehabilitation of the defendant will best be served if his sentence is modified to no more than five nor less than two years. [53 *N. J.* at 18–19].

For similar reasons, I find the sentence manifestly excessive and would modify defendant's terms to a maximum of five years at the Youth Correctional Institution complex.

342

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*For reversal*—Justice PASHMAN—1.