**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3502-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN T. BRAGG,
a/k/a JOHN WHITE,

     Defendant-Appellant.

_____

Argued April 29, 2024 – Decided May 7, 2024

Before Judges Mawla, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-12-0715.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

Colin J. Rizzo, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Colin J. Rizzo, of counsel and on the brief).

PER CURIAM

Defendant John T. Bragg appeals from his convictions for: first-degree attempted murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:5-1(a)(1), (counts one and two); first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1) and (2), (counts three, four, and five); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), (counts six and seven); third-degree terroristic threats, N.J.S.A. 2C:12-3(b) and 2C:12-3(a), (counts eight and ten); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), (counts fourteen and fifteen); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2), (count seventeen); and lesser-included offenses of harassment, N.J.S.A. 2C:33-4(a), (counts eleven and twelve).[1] After merging the remaining counts (nine, thirteen, sixteen, eighteen, and nineteen), the trial judge sentenced defendant to an aggregate term of life imprisonment, which defendant also challenges on this appeal. We affirm.

In the early morning hours of October 1, 2017, Trenton Police Officers Frankie Guzman and Tomas Martinez were dispatched to a ninth-floor apartment located in a high-rise complex on Cooper Street for a domestic

---

[1] Counts eleven and twelve were originally indicted as second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), and third-degree terroristic threats, N.J.S.A. 2C:12-3(b).

dispute. When Officer Guzman approached the apartment and knocked on the door, a female voice asked who was at the door. Officer Guzman told her it was the police, and the voice instructed him to come in. When Officer Guzman tried the door, it was locked.

A male voice then asked who was at the door, and Officer Guzman again responded that it was the police. After another exchange with the female voice, the officer heard "some sort of physical altercation happening, and a female voice definitely in distress and asking for help." The officers kicked down the door on the third attempt and saw a "Black male, skinny in stature covered in blood" who seemed "[s]cared like he had been fighting for his life." That man, whom they later identified as Daquan Anderson, had a piece of porcelain in his hand. When he saw the officers, he yelled: "[H]elp, help. He's killing her, he's stabbing her."

As officers followed the man into a darkened hallway inside the apartment, Lorenza Fletcher emerged and began running toward Officer Guzman. He testified Fletcher

> was completely covered in blood, naked. At first[, he]
> didn't know she was naked because there was so much
> blood until she got out into the hallway.
>
> . . . .

[S]he was definitely in the fight for her life. She was scared, crying, breathing very heavily and just kept saying . . . something [like] . . . he killed me or he's trying to kill me.

Officers saw Anderson with a small child, L.I., who is Fletcher's three-year-old son. Officer Guzman testified the child's "t-shirt was covered in blood," but aside from a small mark on his elbow, the child was uninjured. Fletcher and Anderson had numerous wounds.

When paramedics arrived, they determined Fletcher had a tension pneumothorax, which is a bleeding into her chest cavity. This required them to perform a needle decompression by inserting a large catheter into her chest to evacuate air or blood and allow the lungs to expand properly. Paramedics also noted Anderson was bleeding from his arms and neck. A paramedic testified Anderson also "had some sort of shoelaces wrapped around both wrists and . . . ankles."

At the hospital, a physician treated Fletcher for the pneumothorax, as well as multiple laceration wounds on her face, scalp, chest, neck, arms, and hands. Fletcher also had surgery to repair the tendons in her hands. The same physician also treated Anderson for wounds on his arms, right side of his neck, shoulder, and hand.

A-3502-21

According to Officer Guzman, when police found defendant inside the apartment, he "was calm, he cooperated, he laid there" but he "had a sweater . . . covering his head and his face" and the sweater had blood on it. When the sweater was removed, it revealed "a real big gash wound laceration to the left side of his head." At the hospital, defendant was treated for: a concussion; two large lacerations on his scalp and forehead; and several smaller lacerations to his head.

After everyone was removed from the apartment, officers returned to inspect the crime scene. Detective Samuel Gonzalez recalled it seemed to be "a vacant apartment." Sergeant Luis Nazario testified that "it looked like a vacant apartment somebody may have moved out of. It looked like they were beginning to move in, but there was next to nothing in there," and the only items in the apartment were a deflated air mattress, a curtain that was knocked down, and "some stuff in the kitchen, like a frying pan . . . . But it was . . . almost empty."

Anderson and Fletcher testified for the State, and defendant testified in his own defense. Fletcher had a history of drug abuse and had sent L.I. to live with her mother while Fletcher attended a rehabilitation facility. Although Fletcher saw her son every day, she was not allowed to stay with him.

5

Fletcher met defendant in the summer of 2017. She would have sex with him in exchange for Percocet and cocaine. She testified he assaulted her shortly after they first met, and there were other occasions when he smacked, choked, or threatened to kill her. Nevertheless, Fletcher and defendant continued to see each other regularly and defendant gave her a phone.

Anderson testified he and Fletcher are cousins and he has known her his entire life. They were close and would see each other multiple times a week. He met defendant through Fletcher, in the summer of 2017, and defendant would call his cell phone whenever he could not find Fletcher. He described Fletcher's relationship with defendant as transactional, "sex for money and drugs." Although Anderson used drugs, and testified defendant had offered it to him, he did not accept drugs or money from defendant because he had his own supply.

On September 30, 2017, Anderson, Fletcher, and L.I. attended Fletcher's mother's wedding and reception. That night, they returned to Anderson's cousin's house,[2] where Anderson had been staying. After changing out of her wedding clothes, Fletcher called defendant to have him bring her a baby bottle, Percocet, and cocaine.

---

[2] This was a different cousin than Fletcher.

Defendant drove Fletcher, Anderson, and L.I. to two different stores in search of a bottle, but when they were unsuccessful, defendant told them he wanted to make a stop at the apartment. Fletcher testified she had never been to the apartment and was unaware defendant lived there. Fletcher told Detective Gonzalez that defendant said "he had to make a stop at a friend's house."

Defendant had a key to the apartment. However, Anderson was skeptical the apartment belonged to defendant. He had never visited defendant at the apartment and once inside it he found mail with "a lady's name and address and the place looked vacant. . . . It was . . . empty. There wasn't really nothing in there, [only] an air mattress[ and] a tv. It just didn't look like . . . it was operable." However, defendant tried to make Anderson and Fletcher comfortable by plying them with pills, drugs, and liquor. Once they were settled, defendant left to continue the search for a bottle or sippy cup for L.I.

Anderson explained defendant returned with a used sippy cup that belonged to a girl and still had "juice or something in it." Fletcher became upset and began "calling him all type[s] of names." Fletcher testified she told defendant that L.I. would not use the cup because it had a hard nipple, and L.I. liked the soft kind. Defendant became angry, and Fletcher said they were going to leave. Fletcher called a taxi using Anderson's phone.

7

Defendant asked Anderson if he agreed with Fletcher's name-calling, and when Anderson agreed and said defendant was "stupid for bringing that cup in here," defendant became angry. Anderson testified defendant "jumped up and punched [Anderson] in [the] face" and a fight ensued. During the fight, Anderson saw a knife jutting out of his hand. He testified as follows:

> I didn't even see or notice [that defendant] had enough time to even pull out a knife so maybe he had already had it or whatever. I don't know. But I know the knife came out of my hand. I looked and it's going out again. . . . I'm, like, Lorenza, . . . he just stabbed me. Like, this man just stabbed me. . . . [S]o [I] just, grab [L.I.] and I'm . . . trying to think . . . what do I do now. So I'm . . . backing up towards the window. I start kicking out a window but . . . in my head, [I'm thinking] if you kick this window out, he's going to throw you out of it so I'm just trying to think of things to do, you know.
>
> And so then he kind of gave me, like, an ultimatum, 'cause after that, he's, like, listen, man. [S]he's going to die today. You have a chance to live and, if you want to live, that starts by me tying you up.

Fletcher testified she saw defendant and Anderson "tussling" and that defendant was holding a knife. Her testimony mirrored Anderson's, except she said she was the one who kicked out the window so she could yell for help.

After the initial struggle, Fletcher testified she, Anderson, and L.I. were ushered into the bathroom. Anderson testified he went into the bathroom,

opened the medicine cabinet, and took a piece of a shattered shelf from it, concealing the glass shard in his hand. He dialed 9-1-1, but defendant came in and broke the phone. Anderson and Fletcher took off their shoes, and defendant used their shoelaces to bind Anderson's feet and tie his hands behind his back. Fletcher testified she and Anderson were hurt and bleeding, and defendant told her "I want to have sex with you for the last time." He also told her it was her "killing day." Fletcher undressed, and defendant took her to the living room.

While Anderson was alone in the bathroom, he used the glass shard to free his hands and untied his feet. Although the bathroom door was open, he would not leave the apartment to save himself if he could not save Fletcher and L.I. as well. Anderson removed the toilet tank lid and, when defendant returned to the bathroom, Anderson struck defendant in the head with it.

Anderson testified he and Fletcher then began hitting defendant, and the struggle moved out of the bathroom and into the kitchen, where Anderson armed himself with a pot or pan. While they were fighting, L.I. ran out of the bathroom toward the fight, and the fighting ceased. Fletcher pleaded with defendant not to hurt her son, and defendant returned her to the bathroom, where she started cleaning up the blood. Anderson testified that defendant then faced him, told him he was going to die with Fletcher, and stabbed him in the neck. Anderson

retreated into the bathroom with Fletcher. When defendant came into the bathroom, Anderson tried to douse him with a cleaning product.

As she was cleaning, Fletcher recalled hearing knocking on the apartment door. Although defendant told her to be quiet, she yelled for help. She recalled defendant then jumped on her and started stabbing her while Anderson and L.I. ran for the door. Anderson testified when they heard knocking at the door, Fletcher dropped everything and tried to run to the door, but defendant "grabbed her down by the hair" and began "stabbing away, just stabbing, and she's trying to block with her hands and he's just stabbing." Anderson and Fletcher then began trying to hit defendant, but defendant did not stop stabbing. When Anderson saw his efforts were not working, he went to the apartment door and opened it. Fletcher testified that while Anderson ran to open the door, she tried to grab the knife from defendant and injured her hands to the point where she could no longer bend some fingers on each hand.

Before defendant testified, the trial judge addressed the jury charges for the close of the case, particularly on self-defense, and whether he could charge the jury that defendant had no obligation to retreat in his own dwelling. The judge noted that part of the charge was not included in the jury instruction in defendant's case because, based on "the evidence before the [c]ourt, it

10

appears . . . that [the apartment]'s not his dwelling."  Defense counsel agreed and responded, "I think the charge as it reads is fine the way it is."

Defendant testified he met Fletcher in the summer of 2017.  At the time, "[s]he was heavily into drugs, getting high," but he "liked being around her." He admitted giving her Percocet and cocaine.  When he found out she was "selling herself for two or three Perc[ocet]s," he decided he would give her "the Perc[ocet]s she wanted so she wouldn't have to run the streets and . . . have her son more."  He also enjoyed spending time with L.I. and would take him to the zoo, watch movies, or "just hang out" with him.

Defendant testified he had been living with his niece but was now "in transit" and "in the process of moving into" the apartment complex when he brought Fletcher, Anderson, and L.I. to his apartment the night of the incident. Defendant was not on the lease and paid no rent, but claimed he was subletting the apartment from a customer of his car business by giving a car to the customer in exchange for staying in the apartment for four to six months.  Defendant claimed he had been living in the apartment for a few weeks.  He had a key fob for the apartment, but recalled it only worked sometimes, and other times, he

11

would have to be buzzed in by security.[3]  He previously resided in Georgia.  He had a Georgia driver's license, and his car was registered there.

Defendant acknowledged neither Fletcher nor Anderson had ever been to the apartment.  He claimed he would never have brought them to the apartment "if they didn't have [L.I. with them.]"  He "would have never trusted them in that apartment" because they were the reason he was kicked out of his niece's apartment.  He believed Anderson needed Fletcher because she supplied him with the Percocet.

Defendant left the apartment because Fletcher insisted L.I. needed a sippy cup.  As defendant was driving, Fletcher called saying she wanted to have sex with him.  He believed Fletcher was "trying to hold [him] up" and decided to return to the apartment.  When he returned, he saw his belongings in his duffel bag.  When he confronted Fletcher, he was hit in the head from behind. Defendant attempted to use his mace but could not get the canister out of his pocket.  Meanwhile, Anderson was still swinging at him, so defendant pulled out his knife and stabbed him.

---

[3]  The former director of security for the complex testified someone with defendant's surname signed in as a visitor the night of the incident.  A detective also testified he received the building sign-in sheet, which listed "John Bragg" as a visitor and the name of a different person in the spot designated for the tenant.

A-3502-21

Defendant testified Fletcher joined in the fight, which moved into the bedroom. L.I. was asleep on an air mattress, so defendant tried to stay to the side of the room. When L.I. woke up, Fletcher stopped fighting to grab her son and moved him away from the fight. Fletcher managed to break up the fight, telling Anderson and defendant not to fight in front of her son.

When defendant pulled out his phone, Anderson tried to hit him again, the fighting resumed, and Fletcher again managed to break it up. Fletcher tried to talk to defendant, but he refused to approach her. Defendant testified Fletcher then pretended to tie up Anderson. Defendant followed Fletcher into a room to try to talk to her, but Anderson again struck him from behind with a pan.

Defendant tried to walk to the bathroom, but only made it to the bedroom, where he sat down, and Anderson and Fletcher took the knife from him. He testified he heard them in the bathroom, and believed they were trying to clean up their blood. They also tried to tie him up with shoelaces, but he could not remember which one was tying him up.

According to defendant, when the police knocked on the door, Fletcher went to answer, but Anderson stopped her and handed her the knife. She then attacked defendant, and they began fighting again, with defendant stabbing at Fletcher and Fletcher biting defendant. Anderson answered the door and came

13

back, again striking defendant. When the police entered, defendant fell onto the living room floor while Fletcher ran out. Defendant claimed as soon as the police heard Fletcher's story, they did not listen to his side and instead handcuffed him.

Defendant denied tying up or threatening to kill Anderson. He claimed he never threatened Fletcher, and that "the only thing [he] was doing was trying to survive out of that situation." He testified "[t]hey cracked [him] in the head first." Defendant only used force "because [Anderson] hit [him] in the head, and he still was swinging at [defendant]." He claimed he had no choice but to defend himself. Defendant testified he would have retreated but when Fletcher was pretending to tie Anderson up, defendant claimed "they got [him] blocked off[ and he could] go nowhere."

During its summation, the State pointed out the inconsistencies in defendant's testimony and argued he did not act in self-defense. It argued defendant could recall every detail about Fletcher's and Anderson's actions but could not remember the details about when he claimed he was tied up. The State asked the jury to consider why Fletcher would tie Anderson up, rather than just leave the apartment when defendant was drifting in and out of consciousness or when he dropped his knife, and why would they bind defendant's feet but not his

hands. There were no bindings on defendant's legs when police arrived, but there were bindings on Anderson that were so tight, they were cutting off circulation to his hands. The State pointed out defendant did not leave the apartment, despite the opportunity to do so. Moreover, Fletcher and Anderson had numerous defensive wounds to their hands, whereas defendant did not.

At the conclusion of the case, the trial judge held a charge conference, and regarding the issues raised by defendant here, noted the "self-defense charge obviously is included." The judge asked counsel if they were satisfied with the proposed self-defense charge, which addressed self-defense but did not state the apartment was defendant's dwelling, and both sides responded the instructions were satisfactory.

Following summations, the trial judge instructed the jury at length on self-defense and the duty to retreat. Consistent with instruction that was prepared and discussed during the charge conferences, the charge did not instruct the jury that defendant had no duty to retreat in his own home. The defense did not object to the jury charge. The jury subsequently returned a guilty verdict.

At sentencing, the trial judge found aggravating factors three, six, and nine, N.J.S.A 2C:44-1(a)(3), (6), and (9), and no mitigating factors. He granted the State's motion for an extended term and sentenced defendant to life

15

imprisonment on count three, which ran concurrent to two twenty-year sentences on counts one and two, and two thirty-year sentences on counts four and five.

Defendant raises the following points on appeal:

POINT I

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY A FAULTY SELF-DEFENSE JURY CHARGE THAT FAILED TO CORRECTLY INSTRUCT THE JURY THAT DEFENDANT HAD NO DUTY TO RETREAT IN HIS OWN DWELLING. U.S. CONST. AMEND. XIV; N.J. CONST. ART. 1, PARS. 1, 9, AND 10.  (NOT RAISED BELOW).

POINT II

THE IMPOSITION OF AN EXTENDED-TERM SENTENCE OF LIFE FOR KIDNAPPING WAS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE WHERE DEFENDANT RAISED A BONA FIDE CLAIM OF SELF-DEFENSE.

I.

In Point I, defendant argues the self-defense instruction was erroneous because the trial judge did not instruct the jury defendant had no duty to retreat in his own apartment.  Defendant asserts the no-retreat exception applied because he was in the process of moving into the apartment when the incident occurred, and the apartment was his dwelling.  The instruction was critical because so much of the State's case centered on whether and why he did not

16

retreat. He argues the charge led to an unjust result because there was a "very real possibility that the jury found self-defense to be inapplicable because of a duty to retreat from the dwelling—a duty defendant did not have under the law."

"When a defendant fails to object to an error or omission [about a jury charge] at trial, we review for plain error. Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Reversal is warranted only where an error raises "reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)). "The mere possibility of an unjust result is not enough." Ibid. A jury instruction is particularly "crucial to the jury's deliberations on the guilt of a criminal defendant," and "'[e]rrors [having a direct impact] upon these sensitive areas of a criminal trial are poor candidates for rehabilitation' under the plain error theory." State v. Jordan, 147 N.J. 409, 422-23 (1997) (quoting State v. Simon, 79 N.J. 191, 206 (1979)).

A "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State

v. Green, 86 N.J. 281, 287-88 (1981)). Accordingly, "the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Ibid. (quoting State v. Reddish, 181 N.J. 553, 613 (2004)).

Evidence should be viewed in "the light most favorable to the defendant" when deciding whether a defendant is entitled to a jury instruction. State v. Galloway, 133 N.J. 631, 648-49 (1993) (citing State v. Breakiron, 108 N.J. 591, 617 (1987)). However, when reviewing a jury instruction for error, it "must be evaluated in the light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors." State v. Camacho, 218 N.J. 533, 551 (2014) (quoting Kentucky v. Whorton, 441 U.S. 786, 789 (1979)).

The use of force against another person is "justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person." N.J.S.A. 2C:3-4(a). Deadly force is not justifiable when an actor can "avoid the necessity of using such force with complete safety by retreating." N.J.S.A. 2C:3-4(b)(2)(b).

However, "[t]he actor is not obliged to retreat from his dwelling, unless he was the initial aggressor." N.J.S.A. 2C:3-4(b)(2)(b)(i). The Model Jury Charges reiterate that where applicable, "[a]n exception to the rule of retreat however, is that a person need not retreat from his or her own dwelling, including the porch, unless he/she was the initial aggressor." Model Jury Charges (Criminal), "Justification—Self Defense: In Self Protection (N.J.S.A. 2C:3-4)" at 3 (rev. Nov. 13, 2023).

In order to succeed on a self-defense claim where the defendant used deadly force, the jury must find that: (1) the defendant had an honest and reasonable belief that deadly force was immediately necessary to protect himself or herself from serious bodily injury or death, and (2) the defendant did not provoke the attacker. N.J.S.A. 2C:3-4(a) and (b)(2)(a); State v. Gentry, 439 N.J. Super. 57, 66-69 (App. Div. 2015). Whether the defendant's belief was reasonable is measured by what the jury, not the defendant, considers reasonable under an objective standard. State v. Bess, 53 N.J. 10, 16 (1968). Accord State v. Handy, 215 N.J. 334, 356-57 (2013).

Applying these principles, we discern no plain error that led to an unjust result. The State presented substantial objective evidence showing the apartment was not defendant's dwelling. Defendant presented only his self-

serving testimony. Moreover, given the guilty verdict returned on fourteen of the nineteen counts, it is clear the jury did not believe defendant's testimony and was obviously convinced he was the aggressor. Indeed, the jury found defendant guilty of kidnapping Fletcher, Anderson, and L.I. This required them to find he purposely acted to unlawfully confine his victims for a substantial period with the purpose to inflict bodily injury or to terrorize them. N.J.S.A. 2C:13-1(b)(2). The jury further found defendant abused or neglected L.I. and purposely harassed Fletcher. The evidence simply did not support a finding of self-defense, regardless of whether the apartment belonged to defendant.

## II.

In Point II, defendant argues the life sentence he received for count three was excessive. He claims the court failed to find mitigating factors, including that: he acted under strong provocation; there were substantial grounds tending to excuse or justify his conduct; and the victims induced or facilitated defendant's conduct. N.J.S.A. 2C:44-1(b)(3), (4), and (5). He reiterates the mistaken jury charge on self-defense led the jury to convict him on the first-degree kidnapping charge in count three, which in turn prevented the judge from considering these mitigating factors, leading to an unjust sentence.

20

On appeal, we review a sentencing decision for an abuse of discretion. State v. Miller, 237 N.J. 15, 28 (2019). We must "consider whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)). We may not substitute our judgment for that of the sentencing court. State v. Fuentes, 217 N.J. 57, 70 (2014). A sentence will be affirmed unless a trial court violated the sentencing guidelines, found aggravating or mitigating factors not based on competent and credible evidence in the record, or applied the guidelines in such a manner as to "make[] the sentence clearly unreasonable so as to shock the judicial conscience." Miller, 237 N.J. at 28 (quoting Fuentes, 217 N.J. at 70).

At sentencing, a court must identify and balance the aggravating and mitigating factors pursuant to N.J.S.A. 2C:44-1(a) and (b) and explain the factual basis supporting its findings. Fuentes, 217 N.J. at 73, 81. "It is sufficient that the trial court provides reasons for imposing its sentence that reveal the court's consideration of all applicable mitigating factors in reaching its sentencing decision." State v. Bieniek, 200 N.J. 601, 609 (2010). "After

A-3502-21

balancing the factors, the trial court may impose a term within the permissible range for the offense." Id. at 608.

A defendant convicted of first-degree kidnapping "shall be sentenced" to a term of imprisonment "for a specific term of years which shall be between [thirty] years and life imprisonment." N.J.S.A. 2C:43-7. Under N.J.S.A. 2C:44-3(a), this sentence may be extended if the defendant is a "persistent offender" who is at least twenty-one years of age and "who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least [eighteen] years of age." Defendant conceded he was eligible for an extended term under this statute due to his age and prior record, which included multiple convictions in New Jersey and in three other states, one of which was a federal offense. The judge noted defendant had spent most of his adult life in prison.

The sentencing record shows the trial judge considered the mitigating factors argued by defendant but found them inapplicable. As relates to the arguments raised on appeal, the judge found the verdict showed the jury "emphatically" rejected defendant's self-defense theory. Moreover, based on the judge's observations of the trial, he found defendant's testimony "was self-serving, and not credible, and very simply not true."

The judge rejected defendant's argument regarding mitigating factor two, noting he agreed with the jury's finding that "defendant's conscious object was to kill." Defendant's actions, therefore, were not merely negligent or reckless but purposeful.

The judge rejected mitigating factor three because defendant's actions were the result of "not having his evening go exactly the way he wanted it to go," not, as defendant argued, a result of any provocation. Mitigating factor four was also inapplicable because there was "no basis to justify . . . defendant's conduct."

As for the aggravating factors, the judge considered defendant's past charges, convictions, and sentences, and concluded defendant was likely to reoffend because of his lengthy criminal history. Further, the sentence would deter defendant and protect society.

The trial judge found "[t]he aggravating factors substantially outweigh the non-existent mitigating factors." He concluded the extended sentence was appropriate.

Having considered defendant's arguments in light of the record, we are satisfied the sentence was supported by the credible evidence in the record and was not an abuse of discretion. The trial judge's findings are consistent with the

23

sentencing guidelines and applicable law. The evidence in the record supported the application of the aggravating factors found by the judge and did not support the application of any of the mitigating factors argued by defendant at sentencing or on appeal. Under the facts and circumstances presented, defendant's extended sentence of life imprisonment does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24